PROPRIETARY AND CONFIDENTIAL INFORMATION

# Educational Broadband Service Lease Agreement

This Educational Broadband Service ("*EBS*") Lease Agreement ("*Agreement*") is executed on MAy 18, 2007 (the "*Effective Date*"), by and between University of North Alabama, an Alabama University with its principal offices at 103 Bibb Graves Hall, Florence, Alabama 35632 ("*Lessor*"), and Utopian Wireless Corporation, a Delaware corporation with its principal offices at 1010 Wayne Avenue Suite 950, Silver Spring, Maryland 20910 ("*Lessee*"). *Lessor* and *Lessee* agree as follows:

## BACKGROUND

The Federal Communications Commission ("*FCC*") had authorized *EBS* channels A1, A2, A3, and A4 (the "*Channels*") under call sign WNC713 (the "*License*") to *Lessor* to transmit in the Muscle Shoals, Alabama area (the "*Market*"). The *License* expired without a timely-filed renewal on July 14, 2005, and was canceled by the *FCC* on December 16, 2006, however *Lessor* intends to petition the *FCC* to reinstate and renew the *License*.

*Lessor* is willing to permit *Lessee* to lease all the capacity on the *Channels* that, pursuant to the *FCC Rules* and subject to *FCC* approval, can be made available for commercial use, in accordance with the terms and conditions below.

## TERMS AND CONDITIONS

1. **Construction of Lease.**

    1.1. **Interpretation.** The Parties and their respective counsel have negotiated this *Agreement*. This *Agreement* will be interpreted in accordance with its terms and without any strict construction in favor of or against either Party based on draftsmanship of the *Agreement* or otherwise.

    1.2. **Applicable Law.** The validity, construction and performance of this *Agreement* will be governed by and construed in accordance with the laws of the State of Delaware, without regard to the principles of conflict of laws.

    1.3. **Reference to Sections.** Unless otherwise stated, references in this Lease to a "Section" or "Sections" refer to the Sections of this *Agreement*.

    1.4. **Reference to Party or Parties.** The term "Party" as used herein refers to either the *Lessor* or *Lessee* individually, and the term the "Parties" refers to both *Lessor* and *Lessee* collectively.

    1.5. **Headings.** The headings and captions used in this *Agreement* are for convenience only and are not to be considered in construing or interpreting this *Agreement*.

    1.6. **Definitions.** The capitalized and italicized terms and phrases used in this *Agreement* are defined as follows:

        1.6.1. "*Agents*": refers collectively to employees, shareholders, agents, attorneys, and accountants.

        1.6.2. "*Agreement*": refers to this Educational Broadband Service Lease Agreement.

PROPRIETARY AND CONFIDENTIAL INFORMATION

**1.6.3.** *"Channels"*: the *EBS* channels as specified in the Background of the *Agreement* and associated or transitioned spectrum and guardband.

**1.6.4.** *"Commencement Date"*: the date upon which the *FCC* has approved by *Final Order* the *FCC Long Term Lease Application*.

**1.6.5.** *"Communications Act"*: the Communications Act of 1934, as amended.

**1.6.6.** *"Dedicated Equipment"*: the portion of the transmission equipment (not including any tower rights) in operation at the time *Lessor's* option to purchase is triggered, as defined in Section 7.2 below, that is dedicated solely to transmission of *Lessor's Reserved Capacity* on the *Channels*.

**1.6.7.** *"EBS"*: Educational Broadband Service.

**1.6.8.** *"EBS Equipment"*: the transmission equipment currently in place for the *Channels*.

**1.6.9.** *"Effective Date"*: is specified in the first paragraph of the *Agreement*.

**1.6.10.** *"FCC"*: Federal Communications Commission.

**1.6.11.** *"FCC Long Term Lease Application"*: all forms and related exhibits, certifications, and other documents necessary to obtain the *FCC's* consent to this *Agreement* and satisfy the *FCC's* requirements for long term de facto lease approval as set forth in 47 C.F.R. § 1.9030(e).

**1.6.12.** *"FCC Rules"*: rules, regulations, and policies of the *FCC* as modified from time to time by the *FCC*.

**1.6.13.** *"Final Order"*: an order issued by the *FCC* that can no longer be appealed.

**1.6.14.** *"GSA"*: geographic service area.

**1.6.15.** *"Information"*: all non-public information disclosed between the Parties in pursuance of this *Agreement*, whether written or oral, that is designated as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as confidential. The term *Information* does not include information that: (1) has been or becomes published in the public domain without breach of this *Agreement* or breach of a similar agreement by a third party; (2) prior to disclosure hereunder, is property within the legitimate possession of the receiving Party which can be verified by independent evidence; (3) subsequent to disclosure hereunder, is lawfully received from a third party having rights therein without restriction of third party's or the receiving Party's rights to disseminate the information and without notice of any restriction against its further disclosure; or (4) is independently learned by the receiving Party through persons who have not had, either directly or indirectly, access to or knowledge of such *Information* which can be verified by independent evidence.

**1.6.16.** *"Initial Term"*: is defined in Section 2.1 below.

**1.6.17.** *"Interference Consents"*: consent agreement(s) entered into between *Lessor* and a third party/parties, pursuant to the terms described in Section 9 below, in regards to interference the *Channels* receive or transmit.

PROPRIETARY AND CONFIDENTIAL INFORMATION

1.6.18. **"Lessee"**: is specified in the first paragraph of this *Agreement*.

1.6.19. **"Lessee Capacity"**: All capacity on the *Channels* apart from *Lessor's Reserved Capacity*.

1.6.20. **"License"**: the *FCC*-issued authorization held by *Lessor*, whether directly or through a school within *Lessor's* jurisdiction, to construct and operate the *EBS* station with call sign WNC713 serving the *Market* on channels A1, A2, A3, and A4 and any associated or transitioned spectrum and guardband.

1.6.21. **"Lessor"**: is specified in the first paragraph of the *Agreement*.

1.6.22. **"Lessor's Reserved Capacity"**: the capacity on the *Channels* that is required to be set aside for *Lessor*'s use pursuant to *FCC Rules*, as the same may change from time to time.

1.6.23. **"Lower Band Channel"**: a *Channel* located in the spectrum block defined as the lower band segment in the *FCC Rules*.

1.6.24. **"Market"**: is specified in the Background of the *Agreement*.

1.6.25. **"Middle Band Segment Channel"**: the *Channel* the *FCC* grants *Lessor* after the *Transition* which is located in the spectrum block defined in the *FCC Rules* as the middle band segment.

1.6.26. **"Monthly Fee"**: is defined in Section 3.1 below.

1.6.27. **"Order Form"**: *Lessor*'s written request to *Lessee* for *Standard Advanced Services Installation*.

1.6.28. **"Permitted End Users"**: *Lessor* itself and any educational institution or not-for-profit organization or site in the *Market* with whom *Lessor* is working in furtherance of its educational goals.

1.6.29. **"Renewal Date"**: the date that is ten (10) years following the *Commencement Date*.

1.6.30. **"Renewal Term"**: an additional term of ten (10) years.

1.6.31. **"ROFR"**: Right of First Refusal, as defined in Section 4.3 below.

1.6.32. **"Shared Equipment"**: equipment owned by *Lessee* and used in connection with the transmission of *Lessor's Reserved Capacity* on the *Channels* that is not *Dedicated Equipment*, or comparable equipment (not including any tower rights).

1.6.33. **"Standard Advanced Services Installation"**: the customer premises equipment package made generally available to *Lessee*'s retail customers in the *Market*, who subscribe to the same tier of service over *EBS* capacity, at the time *Lessee* receives *Lessor*'s *Order Form*.

1.6.34. **"Swapped Channels"**: the new channels *Lessor* holds after entering an agreement to swap channels, pursuant to the terms of Section 6.3 below.

1.6.35. **"Term"**: refers collectively to the *Initial Term* and any and all *Renewal Terms*.

PROPRIETARY AND CONFIDENTIAL INFORMATION

- **1.6.36. "*Transition*"**: The Transition Plan adopted by the *FCC* in WT Docket No. 03-66 that subjects the *Channels* to relocation to different frequencies and/or to different technical characteristics.
- **1.6.37. "*Upper Band Channel*"**: a *Channel* located in the spectrum block defined as the upper band segment in the *FCC Rules*.
- **1.6.38. "*Wireless System*"**: *Lessee*'s system of advanced services, permitted for *EBS* Spectrum by the *FCC*, in the *Market*.

2. **Lease Term and Renewal.**

    2.1. **Initial Term and Extension.** Subject to Section 2.3 below, the *Initial Term* of this *Agreement* begins on the *Commencement Date* and ends on the date that is ten (10) years from the *Commencement Date*, unless the *Agreement* is terminated earlier in accordance with Section 12 below.

    2.2. **Renewal.** Subject to Section 2.3 below, on the *Renewal Date*, and then again on the date that is ten (10) years thereafter, this *Agreement* will automatically renew in each case for a *Renewal Term*, for a maximum *Agreement* duration of thirty (30) years. The *Renewal Terms* will occur automatically unless *Lessee* notifies the *Lessor* in writing at least ninety (90) days prior to the end of the *Initial Term* or any *Renewal Term* that it declines to renew the *Agreement*. The terms and conditions of this *Agreement* apply to each *Renewal Term*.

    2.3. **Renewal of License and Extension of Agreement.** In the event that the *License* expires without a pending renewal application during the *Term*, this *Agreement* will also expire at such time unless the *License* is renewed and *FCC* authorization for this *Agreement* is extended. *Lessor* and *Lessee* will cooperate to timely file a renewal application for the *License*, in conjunction with a request for an extension of the then-applicable *Initial Term* or *Renewal Term*, to the date that is ten (10) years from the beginning of such *Initial Term* or *Renewal Term*. This *Agreement* will continue to apply unless the *FCC* denies by *Final Order* any application for renewal of the *License* or extension of the *Term*.

3. **Compensation.**

    3.1. **Monthly Fee.** Within five (5) days following the *Commencement Date* and on the first day of each month thereafter throughout the *Term*, *Lessee* will pay *Lessor* a *Monthly Fee* for use of the *Lessee Capacity* of Two Thousand Eighty Three and Thirty Four One-Hundredths Dollars ($2,083.34) per month. The *Monthly Fee* shall be net to the *Lessor* in each year during the *Term*, such that *Lessee* shall pay all costs, expenses, and obligations of every kind necessarily incurred by *Lessor* through *Lessor's* performance of its obligations under this *Agreement*, and the *Lessee* shall indemnify the *Lessor* against such costs, expenses and obligations. Notwithstanding the foregoing, *Lessee* shall not be required to pay, nor indemnify *Lessor* for, any costs, expenses, or obligations resulting from any intentional breach of this *Agreement* by *Lessor*. Nothing contained in this *Agreement* shall require the *Lessee* to pay any tax, assessment, charge, or levy upon the *Monthly Fee* payable by the *Lessee* to *Lessor* under this *Agreement*. The *Monthly Fee* due for any partial calendar month, at the commencement of the *Initial Term* or expiration of the *Term*, shall be prorated accordingly.

    3.2. **Adjustment.** The *Monthly Fee* will be adjusted on a pro rata basis during the *Term* in the event that any portion of *Lessee Capacity* available as of the *Effective Date* becomes unavailable to *Lessee* for the uses contemplated by *Lessee* under this *Agreement* in any part of the *GSA* of

PROPRIETARY AND CONFIDENTIAL INFORMATION

the *Channels* as such *GSA* exists as of the *Effective Date*. For the purpose of the foregoing, the pro-ration shall be based upon the difference in total MHz of capacity multiplied by the population covered by such capacity at the time such capacity becomes unavailable.

**3.3.   Payment Receipt Address.**

University of North Alabama

ONE HARRison PlAzA
Box 5003
Florence, AL 35632
Attn: Vice President For Business & Financial Affairs

**3.4.   W-9.** Within ten (10) days following the execution of this *Agreement*, *Lessor* shall deliver a completed Internal Revenue Service form W-9 to *Lessee*.

**4. Exclusivity and Right of First Refusal.**

**4.1.   Notice of Communications.** *Lessor* shall notify *Lessee* within thirty (30) business days of any communication relating to the *License* or this *Agreement*, whether proposals, requests for information, or otherwise, with any third party, regardless of whether *Lessor* responds to such communication. In the case of oral communications, *Lessor* shall identify the third party and summarize the substance of the communication in its notice to *Lessee*. In the case of written communications, *Lessor* shall forward a copy to *Lessee* and identify the source of the communication.

**4.2.   Exclusivity.** While this *Agreement* is in effect, *Lessor* will not negotiate or contract with any third party to lease, sell, assign, transfer or use any of the capacity of the *Channels* or any option therefore, except that, subject to the ROFR set forth in Section 4.3 below, *Lessor* may so negotiate and/or contract during:

**4.2.1.**   the last ninety (90) days of the *Term*, and

**4.2.2.**   the last ninety (90) days of any *Initial Term* or *Renewal Term* wherein *Lessee* notifies *Lessor* that it has elected not to renew the *Agreement* in accordance with Section 2.2 above.

**4.3.   Right of First Refusal ("ROFR").** During the *Term* and for the twenty-four (24) months following the expiration or termination of this *Agreement* (unless this *Agreement* is terminated solely as a result of *Lessee*'s default), *Lessee* or *Lessee*'s designee will have a right of first refusal with respect to any and all bona fide offers, of any kind, received by *Lessor* to acquire any or all of the *Channels* (if *FCC Rules* allow it and the *Lessor* desires to sell), lease or otherwise use any of the capacity on the *Channels* (or any part thereof) in any manner, or to acquire an option to acquire, lease or otherwise use any of the capacity on the *Channels* (or any part thereof) from a third party which offer *Lessor* otherwise intends to accept. *Lessor* will notify *Lessee* in writing of any such bona fide offer, including the terms of the offer, within thirty (30) days following *Lessor*'s determination to accept the offer. *Lessee* will notify *Lessor* within thirty (30) days following receipt of such notification if it is exercising its ROFR on the same terms and conditions of the third party offer, subject to substitution of consideration pursuant to section 4.4 below. In the event that *Lessee* fails to exercise its ROFR, *Lessor* will have one hundred eighty (180) days from the expiration of *Lessee*'s thirty

*PROPRIETARY AND CONFIDENTIAL INFORMATION*

(30) day response period to enter into an agreement with the offeror on the same terms and conditions as were provided in *Lessor's* notice of the third party offer to *Lessee*. If, within the one hundred eighty (180) day period, *Lessor* does not enter into a binding agreement with the offeror on the same terms and conditions as were provided in *Lessor's* notice of the third party offer to *Lessee*, then *Lessee's* ROFR shall remain in effect pursuant to the terms stated in this Section. If, within the one hundred eighty (180) day period, *Lessor* enters into a binding agreement with the offeror on the same terms and conditions as were provided in *Lessor's* notice of the third party offer to *Lessee*, then *Lessee's* ROFR will terminate; provided, however, that should *Lessor's* agreement with the offeror be terminated within twenty-four (24) months after the expiration or termination of this *Agreement*, *Lessee's* ROFR will be reinstated for the remainder of the twenty-four (24) month period or for a period of one hundred eighty (180) days, whichever is longer. The terms will be ratified in a separate agreement. All materials exchanged under this ROFR are subject to the non-disclosure provisions of Section 14 of this *Agreement*.

4.4. **Form of Consideration and Determination of Value.** Subject to, and without limiting *Lessee's* rights described in Section 4.3 above, if the whole or any part of the consideration of the third party offer is in a form other than cash, then *Lessee* may meet such non-cash consideration using cash, comparable non-cash consideration, or both in its acceptance notice. If *Lessor* does not accept *Lessee's* offer of a cash substitute for the non-cash consideration, then *Lessor* must notify *Lessee* in writing of *Lessor's* estimate of a fair cash substitute within fifteen (15) days after *Lessor's* receipt of *Lessee's* acceptance notice. *Lessor's* failure to notify *Lessee* of its estimate of a fair cash substitute within the prescribed fifteen (15) day period shall be deemed an acceptance of *Lessee's* cash-substitute offer. If *Lessor* rejects *Lessee's* cash-substitute offer, then *Lessee* will have ten (10) days from receipt of *Lessor's* rejection to notify *Lessor* of its election to (1) adopt *Lessor's* stated cash value, or (2) resolve the valuation issue through good faith negotiation with *Lessor*. In any case where good faith negotiation is invoked, *Lessor* and *Lessee* shall use best efforts to come to agreement on the fair cash substitute within five (5) days. In the event *Lessor* and *Lessee* do not come to agreement on the fair cash substitute at the conclusion of such good faith negotiation, the fair cash substitute shall be deemed to be that value half way between *Lessor's* stated fair cash value and *Lessee's* offer of a cash substitute. Upon determination of the fair cash substitute, *Lessee* shall have ten (10) days to exercise its ROFR pursuant to section 4.3, substituting the determined fair cash substitute for the third party non-cash consideration. *Lessor's* failure to execute a contract to implement the third-party offer within one hundred eighty (180) days after the five (5) day good faith negotiation period restores this ROFR.

5. **Frequency Band Transition.** *Lessor* will consult with *Lessee* before agreeing to any change of frequencies or characteristics of the *Channels*, and will fully involve *Lessee* in all of its interactions with any third parties concerning transitions to channel plans required or allowed as an outcome of the *FCC's Transition* proceedings. In the event that neither *Lessee* nor any third party initiates and/or completes the *Transition* of the *Channels* within the time frames specified by the *FCC*, *Lessor* may, at its sole option, avail itself of any "self-transition" rights made available pursuant to *FCC Rules*.

6. **Capacity Requirements and Uses.**

PROPRIETARY AND CONFIDENTIAL INFORMATION

6.1. **Lessor's Reserved Capacity.** Consistent with *FCC Rules*, and as designated by *Lessee* from time to time, *Lessor's Reserved Capacity* may be shifted or loaded on any *Channel*, or portion thereof, including a *Middle Band Segment Channel*. To the extent that *Lessor's Reserved Capacity* is determined as a percentage or portion of the digital capacity on the *Channels*, such capacity shall be determined by *Lessee* in accordance with the processes generally used by it to determine capacity use.

6.2. **Use of Capacity.** Upon consent by the *FCC* to *Lessee's* leasing of the excess capacity on the *Channels*, *Lessee* will have the exclusive right to use all *Lessee Capacity*. *Lessee* may use *Lessee Capacity* in any manner and for any purpose that is lawful, in analog, digital, or any other format, including those that may be authorized in the future by the *FCC*. *Lessor* will use the *Lessor's Reserved Capacity* solely to satisfy the minimum educational use requirements for *EBS* channels pursuant to *FCC Rules*.

6.3. **Channel Swapping; Costs.** With the consent of *Lessor*, which consent will not be unreasonably withheld, conditioned or delayed, *Lessee* may require *Lessor* to enter into agreements to swap some or all of its *Channels* for other channels in the *Market*, and in connection therewith file any necessary *FCC* applications to accomplish the swap, so long as there is no material difference in the operational capability or value of the *Swapped Channels* as compared to *Lessor's* previous *Channels* taking into account such factors as the *GSA* (or equivalent service area) and the population therein. It is understood and agreed, however, that *Lessor* shall not be required to consent to any channel swap of an *Upper Band Channel* or *Lower Band Channel* for a *Middle Band Segment Channel*, or to any swap under which the *Swapped Channels* provide less contiguous spectrum licensed to *Lessor* than *Lessor's* previous *Channels*. *Lessee* agrees to bear all costs and expenses associated with the implementation of channel swapping, including the reasonable out of pocket costs of *Lessor's* engineering consultants and attorneys.

6.4. **Reassessment of Educational Requirements.** On the fifteenth, twentieth, and twenty-fifth anniversary of the *Commencement Date*, *Lessor* may notify *Lessee* of any changes in *Lessor's* educational use requirements in light of changes in educational needs, technology, and other relevant factors. *Lessor* may then obtain access to such additional required services, capacity, support, and/or equipment for use solely in furtherance of *Lessor's* educational mission at a price the greater of: (a) the lowest price made available by *Lessee* to any retail customer in the *Market*, or (b) *Lessee's* fully loaded cost.

7. **Equipment.**

7.1. **Operation and Maintenance of Equipment.** Before the *Transition* or 90 days prior to the commercial launch of the *Wireless System*, whichever comes first, *Lessor* may operate the *EBS Equipment* at each transmission facility. *Lessor* will perform maintenance it deems appropriate on all such equipment at its own expense, subject to *Lessee's* ultimate control as de facto transferee of the *Channels*. If *Lessor* chooses not to operate the transmission equipment currently in place, then *Lessor* and *Lessee* will cooperate in filing all necessary applications with the *FCC* at *Lessee's* cost to "go dark" and not transmit on the *Channels* for an allowed period of time.

7.2. **Dedicated Equipment Purchase Option.** In the event this *Agreement* expires or is terminated for any reason other than a default by *Lessor*, *Lessor* shall have the option, upon giving notice to *Lessee* within thirty (30) days of such expiration or termination, to purchase

*PROPRIETARY AND CONFIDENTIAL INFORMATION*

or to lease at *Lessee*'s option the *Dedicated Equipment*, or comparable equipment. The price for such equipment shall be equal to the fair market value of the *Dedicated Equipment* at the time of *Lessor*'s notice or, if comparable equipment is provided, *Lessee*'s cost in obtaining such equipment.

7.3. **Shared Equipment Purchase or Lease Option.** In the event this *Agreement* expires or is terminated for any reason other than a default by *Lessor*, *Lessor* shall have the option upon giving notice to *Lessee* within thirty (30) days of such expiration or termination to purchase or lease at *Lessee*'s option any *Shared Equipment*, at a price equal to the *Shared Equipment*'s fair market value for such purchase or lease as applicable.

7.4. **Post-Transition Operation of Equipment on the Channels.** In addition to the foregoing, *Lessee*, at its cost, will construct and maintain facilities for the *Channels* that provide transmission capability sufficient to satisfy minimum build-out or performance requirements applicable to *EBS* channels under standards prevailing at any given time under *FCC Rules*.

8. **Advanced Wireless Services for Permitted End Users.** After commercial launch by *Lessee* of its *Wireless System* on the *Channels* in the *Market*, *Lessor* may request at no cost to *Lessor*, via submission of an *Order Form*, *Standard Advanced Services Installation* of *Lessee*'s wireless services for up to five (5) *Permitted End Users* that are located within *Lessee*'s then-serviceable area of the *GSA* for the *Channels*. *Lessee* shall approve *Lessor*'s *Order Form* in its reasonable discretion, taking into consideration relevant technical operational and legal factors. *Lessor* may request such *Standard Advanced Services Installation* for *Permitted End Users* for any tiers of service (with respect to throughput) that *Lessee* makes available to commercial customers utilizing *EBS* or BRS capacity in the *Market*; provided, however, that the number of *Permitted End Users* shall at all times be limited by the *Lessor*'s *Reserved Capacity*, which may not be exceeded when the ordered throughput or capacity for all *Permitted End Users* in the *Market* are aggregated.

   8.1. **Terms of Use.** *Lessor*'s ordering and use of the *Standard Advanced Services Installation*, and the use of such services by *Lessor*'s users and *Permitted End Users*, shall be governed by the acceptable use policy and terms of service, and such other policies of general applicability that apply to such services, which are subject to amendment; provided, however, that financial terms contained in the terms of service shall not apply to such services to *Lessor* or *Permitted End Users* that are provided free of charge pursuant to this Section 8. In addition to the foregoing policies, *Lessee* may specify from time to time, in its sole discretion, reasonable procedures for the activation, addition, deletion or substitution of services to *Lessor*, its users and *Permitted End Users*.

   8.2. **Equipment and Software.** For *Lessor* and any *Permitted End Users* for whom *Lessee* has provided a *Standard Advanced Services Installation*, *Lessee* shall make available any equipment, services, or software upgrades that *Lessee* makes generally available to *Lessee*'s retail customers subscribing to the same tier of service in the *Market* over BRS or *EBS* facilities. In the event that any equipment upgrade involves replacement of equipment, the replaced equipment shall be returned to *Lessee* or its designee and title to the replacement equipment shall transfer to *Lessor* or its designee.

   8.3. **Title.** All equipment provided by *Lessee* to *Lessor* as part of *Standard Advanced Services Installations* for *Permitted End Users* shall be the property of *Lessor* or its designee(s), free and clear of all liens and encumbrances, when paid in full (if any payment is required). *Lessor*

*PROPRIETARY AND CONFIDENTIAL INFORMATION*

shall own, and be solely responsible for the maintenance and operation of, all facilities installed at *Lessor's* locations and receive sites, including the sites of its *Permitted End Users*.

9. **Interference Consents.** *Lessor* will enter into *Interference Consents* with third parties relating to the *Channels* at *Lessee's* expense, as *Lessee* reasonably requests and without any additional compensation, provided that such *Interference Consents* do not result in a reasonably foreseeable material degradation in the value of the *Channels*; and provided further that *Interference Consents* that involve fair and reciprocal rights and limitations for and on the operation of *Lessor's* facilities and the facilities of the other party in connection with system coordination inside *GSAs* and at *GSA* boundaries will not be deemed to cause material degradation in value. *Lessee* will negotiate and draft the *Interference Consents* at *Lessee's* expense and make any consideration payments due to third parties under the *Interference Consents*. *Lessor* will not enter into or issue any *Interference Consents* without *Lessee's* prior written consent.

10. **Applications and Fees.**

    10.1. **Application Preparation.** *Lessee* will prepare and submit in its name all applications, amendments, petitions, requests for waivers, and other documents necessary for the proper operation of *Lessee Capacity*. *Lessor* will file all applications, amendments, petitions, requests for waivers, and other documents necessary for the modification, maintenance and renewal of the *License* that, under *FCC Rules*, may only be filed by *Lessor*, including any such filings reasonably requested by *Lessee*. *Lessee* will have its regulatory counsel prepare such documents on *Lessor's* behalf at *Lessee's* sole expense. *Lessee* will also have *Lessee's* legal counsel prepare a petition for reinstatement and renewal of the canceled *License*, along with all associated waivers required, at *Lessee's* sole expense. The Parties will cooperate in the preparation and submission of all applications, amendments, petitions, requests for waivers, and other documents necessary to secure any *FCC* approval, consent or other action required to effectuate this *Agreement*. *Lessor* will not be responsible for any expenses, fees or costs under this subsection 10.1.

    10.2. **Application Costs.** *Lessee* will, at its own expense, prepare all applications, notices, certificates, exhibits, *Interference Consents*, approvals, or authorizations that *Lessee* submits to the *FCC* or seeks to have *Lessor* submit to the *FCC* pursuant to the *Agreement*. *Lessee* will also promptly pay or reimburse *Lessor* for its reasonable out-of-pocket expenses in connection with the activities requested or required of *Lessor* by *Lessee* under this *Agreement*, including all such filings prepared by *Lessee's* legal counsel on behalf of *Lessor*. *Lessor* will not be responsible for any expenses, fees or costs under this subsection 10.2.

    10.3. **Regulatory Fees.** *Lessee* will pay any federal regulatory fees associated with the *License* upon receipt of notice that such fees are due.

    10.4. **FCC Long Term Lease Application.** Within ninety (90) days following reinstatement and renewal of the *License* by the *FCC* by *Final Order*, the Parties agree to cooperate as required to fully prepare, file, prosecute and defend the *FCC Long Term Lease Application*, all at *Lessee's* expense. In the event a petition for reconsideration is filed against the grant of an *FCC Long Term Lease Application*, or if the *FCC* determines to reconsider such grant on its own motion, *Lessee* shall determine at its option whether to delay commencement of the *Initial Term* until resolution of such reconsideration and, in the event of such delay, it will notify *Lessor* in writing.

PROPRIETARY AND CONFIDENTIAL INFORMATION

11. **Transfers or Assignments.** Subject to Sections 15.6 and 15.7 below, *Lessor* will not assign or transfer its rights and/or obligations under this *Agreement*, including the obligation to hold the *License*, without the prior written consent of Lessee, such consent not to be unreasonably withheld, conditioned or delayed.

12. **Termination of Agreement.**

    12.1. This *Agreement* will automatically terminate with respect to the *License* or affected *Channel(s)* upon an *FCC Final Order* revoking, terminating, canceling or denying renewal of the *License* or any *Channels* therein.

    12.2. This *Agreement* may be terminated by either Party upon uncured material breach of the other Party, provided that the breaching Party shall be provided with written notice by the non-breaching Party of the alleged grounds for the breach and allowed a thirty (30) day period for cure following such notice; provided, however that if the defaulting Party proceeds with reasonable diligence during such thirty (30) day period and is unable, because of circumstances beyond its control or because of the nature of the default, to cure the default within such applicable time period, the time for cure shall be extended, but in no event beyond one hundred eighty (180) days after receipt of written notice from the non-defaulting Party.

    12.3. The Parties will notify the *FCC* of the termination of this *Agreement* with respect to the *License* or any of the *Channels* within ten (10) calendar days following the termination.

13. **Competition.** *Lessor* agrees that it will not, during the *Term* of this *Agreement*, engage in building, operating, managing or distributing a wireless broadband network on a for-profit basis.

14. **Confidentiality and Non-Disclosure.**

    14.1. **Confidentiality of the Terms of this Agreement.** The terms of this *Agreement* that are not otherwise required to be disclosed to the *FCC* in support of the lease applications or notices submitted to the *FCC* will be kept strictly confidential by the Parties and their *Agents*, which confidentiality obligation will survive the termination or expiration of this *Agreement* for a period of two (2) years. The Parties may make disclosures as required by law, and to *Agents* as required to perform obligations under the *Agreement*, provided, however, that the Parties will cause all *Agents* to honor the provisions of this Section. In addition, *Lessee* may disclose this *Agreement* to its affiliates, strategic partners, actual or potential investors, lenders, acquirers, merger partners, and others whom *Lessee* deems in good faith to have a need to know such information for purposes of pursuing a transaction or business relationship with *Lessee*, so long as *Lessee* secures an enforceable obligation from such third party to limit the use and disclosure of this *Agreement* as provided herein. The Parties will submit a confidentiality request to the *FCC* in the event the *FCC* seeks from the Parties a copy of this *Agreement* or any other confidential information regarding its terms.

    14.2. **Non-Disclosure of Shared *Information*.** During the *Term* of this *Agreement*, the Parties may be supplying and/or disclosing to each other *Information* relating to the business of the other Party. The *Information* will, during the *Term*, and for a period of three (3) years after the termination or expiration of the *Agreement*, be kept confidential by the Parties and not used for any purpose other than implementing the terms of this *Agreement*. The receiving Party will be responsible for any improper use of the *Information* by it or any of its *Agents*. Without the prior written consent of the disclosing Party, the receiving Party will not

> PROPRIETARY AND CONFIDENTIAL INFORMATION

disclose the *Information* to any entity or person, or the fact that the *Information* has been made available to it, except for disclosures required by law. Each person to whom *Information* is disclosed must be advised of its confidential nature and must agree to abide by the terms of this Section.

15. **FCC-Mandated Leasing Arrangement Obligations.**

    15.1. *Lessor* and *Lessee* are familiar with the *FCC Rules* affecting spectrum leasing and the provision of *EBS*, the *Communications Act*, the Code of Federal Regulations, and all other applicable *FCC Rules*, and agree to comply with all such laws and regulations.

    15.2. *Lessee* assumes primary responsibility for complying with the *Communications Act*, and any *FCC Rules* that apply to the *Channels* and *License*, and the *Agreement* may be revoked, cancelled or terminated, in accordance with Section 12 above, by *Lessor* or by the *FCC* if *Lessee* fails to comply with applicable laws and regulations.

    15.3. Neither *Lessor* nor *Lessee* will represent itself as the legal representative of the other before the *FCC* or otherwise, but will cooperate with each other with respect to *FCC* matters concerning the *License* and the *Channels*.

    15.4. If the *License* is revoked, cancelled, terminated or otherwise ceases to be in effect, *Lessee* has no continuing authority or right to use the leased spectrum unless otherwise authorized by the *FCC*.

    15.5. The *Agreement* is not an assignment, sale or transfer of the *License* itself.

    15.6. The *Agreement* will not be assigned to any entity that is ineligible or unqualified to enter into a spectrum leasing arrangement under the *FCC Rules*.

    15.7. *Lessor* will not consent to an assignment of a spectrum leasing arrangement unless such assignment complies with applicable *FCC Rules*.

    15.8. *Lessor* and *Lessee* must each retain a copy of the *Agreement* and make it available upon request by the *FCC*, in accordance with the confidentiality provisions in Section 14 above.

16. **Lessor's Authorizations.** *Lessor* warrants and represents that it had obtained, and was in material compliance with, the *License* until the License expiration and that, to *Lessor*'s knowledge, there are no proceedings or complaints threatened or pending before any local, state or federal regulatory body, or any acts or omissions by *Lessor* or its *Agents* as of the *Effective Date*, that could have a material, adverse effect on the *License* upon or after its reinstatement. *Lessor* will use its best efforts to obtain and maintain all licenses, permits and authorizations required or desired by *Lessee*, at *Lessee's* expense, for the use of the *Channels*, and will remain eligible under the *FCC Rules* to provide the *Lessee Capacity*. *Lessor*, at *Lessee's* expense, will take all necessary steps to reinstate and renew the *License*, as required, and will not commit any act, engage in any activity, or fail to take any action that could reasonably be expected to cause the *FCC* to impair, revoke, cancel, suspend or refuse to reinstate or renew the *License*.

17. **Mutual Representations and Warranties.** In addition to any other representations and warranties contained in this *Agreement*, each Party represents and warrants to the other that: (a) it has the full right and authority to enter into, execute, deliver, and perform its obligations under this *Agreement*; (b) it has taken all requisite corporate action to approve the execution, delivery and performance of this *Agreement*; (c) this *Agreement* constitutes a legal, valid and binding obligation enforceable against such Party in accordance with its terms; and (d) its execution of

|PROPRIETARY AND CONFIDENTIAL INFORMATION|

and performance under this *Agreement* will not violate any applicable existing regulations, rules, statutes, or court orders of any local, state, or federal government agency, court or body, or any of its existing contractual obligations.

Further, *Lessor* represents and warrants to *Lessee* that: (i) *Lessor's* operations and activities pursuant to the *License* are conducted in material compliance with all *FCC Rules*, (ii) no person other than *Lessor* has any right, title or interest in or claims to the *License*, and (iii) there is no proceeding now pending or to the knowledge of *Lessor*, threatened against the *Lessor* with respect to the *License*.

18. **Indemnification.**

    18.1.  *Lessor* will defend, indemnify, and hold *Lessee* harmless from and against any liabilities, losses, damages, and costs, including reasonable attorney's fees, resulting from, arising out of, or in any way connected with any intentional breach by *Lessor* of any warranty, representation, agreement, or obligation contained herein. *Lessor's* obligations under this Section will survive the expiration or termination of this *Agreement*.

    18.2.  *Lessee* will defend, indemnify and hold *Lessor* harmless from and against any and all liabilities, losses, damages and costs, including reasonable attorney's fees, resulting from, arising out of, or in any way connected with any intentional breach by *Lessee* of any warranty, representation, agreement or obligation contained herein. *Lessee's* obligations under this Section will survive the expiration or termination of this *Agreement*.

19. **Notices.** Any notice required to be given by one Party to the other under this *Agreement* will be delivered using a reliable national express overnight delivery service and will be effective upon receipt. All notices will be delivered to the Parties at the following addresses:

    **LESSEE**

    Utopian Wireless Corporation

    1010 Wayne Avenue Suite 950

    Silver Spring, Maryland 20910

    Attn: Chief Operating Officer


    **LESSOR**

    University of North Alabama

    103 Bibb Graves Hall   *Box 5003*

    Florence, Alabama 35632

    Attn: *Vice President For Business & Financial Affairs*


    Either Party may change its addresses for receipt of notice or payment by giving notice of such change to the other Party as provided in this Section.

20. **Miscellaneous.**

PROPRIETARY AND CONFIDENTIAL INFORMATION

20.1. **Force Majeure.** Neither Party will be liable for any nonperformance under this *Agreement* due to causes beyond its reasonable control that could not have been reasonably anticipated by the non-performing Party and that cannot be reasonably avoided or overcome; provided that the non-performing Party gives the other Party prompt written notice of such cause, and in any event, within fifteen (15) calendar days of its discovery.

20.2. **Specific Performance.** *Lessor* acknowledges that the *License* and *Channels* subject to this *Agreement* are unique and the loss to *Lessee* due to *Lessor*'s failure to perform this *Agreement* could not be easily measured with damages. *Lessee* will be entitled to injunctive relief and specific enforcement of this *Agreement* in a court of equity without proof of specific monetary damages, but without waiving any right thereto, in the event of breach of this *Agreement* by *Lessor*.

20.3. **Attorneys' Fees.** If any action shall be brought on account of any breach of or to enforce or interpret any of the terms, covenants or conditions of this *Agreement*, the prevailing Party will be entitled to recover from the other its reasonable attorneys' fees and costs, as determined by the court hearing the action.

20.4. **Severability.** If any provision of this *Agreement* is found to be illegal, invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired, unless continued enforcement of the provisions frustrates the intent of the Parties.

20.5. **No Waiver.** No delay or failure by either Party in exercising any right under this *Agreement*, and no partial or single exercise of that right, will constitute a waiver of that or any other right. Failure to enforce any right under this *Agreement* will not be deemed a waiver of future enforcement of that or any other right.

20.6. **Counterparts.** This *Agreement* may be executed in one or more counterparts, each of which will be deemed an original, but which collectively will constitute one and the same instrument. Original signatures transmitted by facsimile will be effective to create such counterparts.

20.7. **Complete Agreement.** This *Agreement* constitutes the entire agreement between the Parties with respect to the subject matter addressed, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, between the Parties or any of their affiliates regarding this subject matter. No amendment to or modification of this *Agreement* will be binding unless in writing and signed by a duly authorized representative of each of the Parties.

**[SIGNATURE PAGE FOLLOWS]**

PROPRIETARY AND CONFIDENTIAL INFORMATION

AGREED TO:

UNIVERSITY OF NORTH ALABAMA

BY: *(signature)*

NAME: **W. Steven Smith, Vice President**

TITLE: **Business & Financial Affairs**

**UNIVERSITY OF NORTH ALABAMA**

UTOPIAN WIRELESS CORPORATION

BY: *(signature)*

NAME: Rudolph J. Geist

TITLE: Chairman and CEO