FILED

2025 Feb-21  PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **UTOPIAN WIRELESS CORPORATION** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  3:24-cv-01644-HNJ** |
| | ) | |
| **KENNETH D. KITTS, in his official Capacity as President of the University of North Alabama, et al., and WILLIAM A. TRAPP, in his official capacity as President of the University of North Alabama Board of Trustees,** | ) ) ) ) ) ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| **Defendants.** | ) | |

## OPPOSITION TO MOTION TO DISMISS

Plaintiff, Utopian Wireless Corporation, submits this Opposition to Defendants', Kenneth D. Kitts and William A. Trapp, Motion to Dismiss [Doc. 13]. Utopian filed its lawsuit against Kitts and Trapp in their official capacities as the state officials in charge of fulfilling the legal duties of the University of North Alabama ("UNA"). Alabama law provides a claim for relief to a contracting party, like Utopian, who has provided goods and services to a public entity against state officials, like Kitts and Trapp, to compel a state official to perform their legal duties or ministerial acts under a contract. Sovereign immunity does not bar Utopian's claim. The parties agreed to specific performance as a remedy to enforce the filing of the long-term lease application, Form 608, with the FCC. Utopian has stated a

claim for relief against Kitts and Trapp for specific performance to file the long-term lease application, as other courts have found in similar cases involving Utopian. Utopian's claim is not barred by any statute of limitations or laches. For these reasons, discussed further below, this Court should deny Defendants' Motion to Dismiss, or in the alternative, grant leave to replead and file an Amended Complaint.

## I.    <u>Background</u>

### A.    <u>Introduction</u>

This litigation involves a contract for goods and services in exchange for lease rights of an educational broadband service (EBS) spectrum license. Years ago, UNA lost its license due to its failure to comply with FCC regulations. UNA contracted with Utopian for helping getting its license back. Utopian performed its end of the bargain under the contract. UNA refuses to perform its end of the bargain—cooperation in filing a document with the FCC—and disavows the existence of the contract altogether. Under Alabama law, Utopian has a claim for relief against the state officials, Kitts and Trapp, who have the duty to fulfill UNA's contractual obligations and whom preside over the same administrative office and board of trustees originally responsible for negotiating, approving, and entering into the May 18, 2007, Educational Broadband Service Lease Agreement ("Agreement"), that is the subject of this matter.

Two federal district courts have already addressed similar 12(b)(6) motions to dismiss brought by school entities against Utopian in substantially similar cases. *See Utopian Wireless Corp. v. Assumption High School*, No. 21-444 2021 WL 2115332 (E.D. La. May 25, 2021); *Utopian Wireless Corp. v. Central Lafourche High School*, 2021 WL 5113165 No. 20-03376 (E.D. La. Nov. 3, 2021). Both courts denied the motions. Those courts' opinions are discussed further below in Section D of this brief regarding whether Utopian has a claim for relief against the school entity arising from the failure to file a long-term lease application, Form 608, with the FCC.

**B.    EBS Licenses, generally**

As summarized by the court in *Assumption High School*:

> Radio frequencies are regulated by the Federal Communications Commission, which allocates them through the issuance of a spectrum license, which authorizes a licensee to use a specific portion of the electromagnetic spectrum, or to use a given frequency band within a given geographic area. Spectrum licensees may enter into individual use or lease agreements with third parties to authorize the third party's use of all or part of the license holder's radio spectrum for commercial purposes.

> Taking as true the complaint's allegations, educational broadband service spectrum licenses are valuable rights regulated by the Federal Communications Commission. As alleged in the complaint, to regulate the use of radio frequencies, the FCC issues licenses that authorize a licensee to transmit on specific frequencies or ranges of frequencies in particular geographic areas. The licenses are called "spectrum licenses" because they authorize the licensee to utilize a portion of the electromagnetic spectrum. Through different licenses, the FCC imposes different restrictions on the manner in which a licensee can use licensed spectrum; for example, the FCC permits licensees to use

certain frequencies for FM radio transmission, cellular telephone transmission, television transmission, or air traffic control transmission.

Educational Broadband Service (EBS) is a kind of spectrum license. It is a prime wireless spectrum band that is currently being used by wireless carriers in the national provision of advanced wireless services, including mobile broadband services. Since January 10, 2005, the FCC's rules allow holders of EBS spectrum to lease their licenses to third-party wireless carriers for 30-year terms. As of April 27, 2020, the FCC began allowing EBS license holders like [schools] to sell their licenses to commercial for-profit entities; such sales were previously restricted to non-commercial nonprofit entities.

An EBS license authorizes a licensee to utilize a 22.5 megahertz wide allocation of spectrum at frequencies within the range of 2496-2690 MHz. Depending on the terms of their licenses and applicable FCC rules, EBS licensees may enter into spectrum leases with third parties, authorizing a third-party lessee to use a portion or all of the EBS license holder's spectrum for commercial purposes. EBS licensees may now sell their licenses to commercial entities.

2021 WL 2115332, at *1; *see also* Complaint, Doc. 1 ¶¶ 6-9.

Spectrum licenses do not convey property rights. "The radio (or electromagnetic) spectrum belongs to no one." *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 50 (2d Cir. 1999). Accordingly, "[a] license does not convey a property right; it merely permits the licensee to use the portion of the spectrum covered by the license in accordance with its terms." *Id.* at 51 (citing 47 U.S.C. § 301 (stating that the purpose of the Federal Communications Act is "to provide for the use of [radio] channels, but not the ownership thereof")); *see also In re Alpine PCS, Inc.*, No. 08-00543, 2008 WL 5076983, at *5 (Bankr. D.D.C. Oct. 10, 2008)

("The rights granted via a license to use any spectrum exclude any property right in the underlying spectrum.").

### C.  <u>UNA lost its license and contracted with Utopian to get it back.</u>

The FCC issued EBS Channels A1 through A4 to UNA. *See* Complaint, Doc. 1 ¶ 10. Prior to Utopian's involvement, UNA *lost* its FCC license on December 16, 2006 for failing to timely file a renewal application. *See* Complaint, Doc. 1 ¶ 14; *see also* Doc. 1-1. To get it back, UNA contracted with Utopian.

On May 18, 2007, Utopian and UNA entered into the Educational Broadband Service Lease Agreement ("Agreement"). Doc. 1-1. As part of the consideration for the agreement, Utopian agreed to pursue reinstatement and a late (by nearly two years) filed renewal of UNA's license at Utopian's sole expense. *See* Complaint, Doc. 1 ¶ 15; Agreement, Doc. 1-1. To fulfill its commitment to UNA to save its license, Utopian, on June 5, 2007, filed a late license renewal application on UNA's behalf. *See* UNA's License Renewal Information, available at https://wireless2.fcc.gov/UlsApp/ApplicationSearch/applMain.jsp?applID=4011950 (a copy of the renewal application is attached for the Court's convenience as Exhibit A);[1] *see also* Complaint, Doc. 1 ¶ 15. As part of its substantial efforts for UNA, Utopian also filed multiple pleadings with the FCC in response to objections

---

[1] *See* Defendants' Memorandum in Support of Motion to Dismiss, Doc. 14, at p. 5, n. 2 which provides the Court with authorities for taking judicial notice of government websites and considering evidence outside of the pleadings.

and petitions filed by other parties opposing UNA's late filed renewal. *See* UNA's License Renewal Information at available link. Due to Utopian's efforts to renew UNA's license, the FCC approved UNA's late filed renewal application and reinstated its license on June 24, 2009. *See id.* (a copy of the FCC's approval letter is attached for the Court's convenience as Exhibit B).

To ensure compliance with FCC's operational requirements, UNA and Utopian further entered into the Equipment Lease, dated October 2011. *See* Complaint, Doc. 1 ¶ 21; Doc. 1-2. In the Equipment Lease, Utopian agreed to provide to UNA wireless link equipment that was required for the operation of the license. *See id.* Utopian sent the equipment to UNA, UNA accepted and installed the equipment with Utopian's assistance, and UNA utilized the equipment to operate its license. *See id.* The installation and use of Utopian's equipment allowed UNA to achieve substantial service compliance with the FCC's mandatory licensing construction requirements and to preserve UNA's license against loss. *See* Complaint, Doc. 1 ¶ 22. UNA continues to be in possession of Utopian's equipment and is continuing to operate the equipment. *See id.*

As a direct result of Utopian's involvement, the FCC reinstated UNA's canceled license. *See id.*

**D.**     <u>The terms of the Agreement</u>

The duration of the Agreement is 30 years (10-year lease terms with automatic renewals unless Utopian chooses not to renew each 10-year term). *See* Agreement, Doc. 1.1, Secs. 21 and 2.2.[2] Having cleared the first hurdle—obtaining reinstatement of UNA's lost license, the parties then agreed to file the long-term lease application, or Form 608, to establish with the FCC Utopian's long-term lease of the EBS license. *See* Complaint, Doc. 1 ¶ 15.

The parties agreed, in Section 10.1 of the Agreement, they "<u>will cooperate in the preparation and submission of all applications … necessary to secure any FCC approval required to effectuate this Agreement</u>." Agreement, Doc. 1-1 (emphasis added). That provision of Section 10.1 squarely covers filing of a long-term lease application that is required to be prepared, signed and submitted with the FCC by both Utopian and UNA and does not relate to any FCC applications required to be prepared, signed and submitted solely by Utopian that are "necessary for the proper operation" of the channels. *Id.* In Section 16 of the Agreement, UNA further agreed to "use its best efforts to obtain and maintain all licenses, permits and authorizations required or desired by" Utopian. *Id.* UNA also agreed in Section 16 to "take all necessary steps to renew the License, as required, and will not commit any act,

---

[2] Defendants incorrectly state that the Agreement "provided for a ten-year lease of the channels." Doc. 14 at p. 3.

engage in any activity, or fail to take any action that could reasonably be expected to cause the FCC to impair, revoke, cancel, suspend or refuse to renew the License." *Id.*

Regarding the filing of the long-term lease application, Section 10.4 provided that "[w]ithin ninety (90) days following reinstatement and renewal of the License by the FCC by Final Order, <u>the Parties agree to cooperate as required to fully prepare, file, prosecute and defend the FCC Long Term Lease Application</u>, all at Lessee's expense." *Id.* (emphasis added). Once the long-term lease application was filed and approved by the FCC, the parties agreed that Utopian would start making monthly payments to UNA. *See* Agreement, Doc. 1-1, Sec. 1.6.4. Utopian agreed to pay UNA $2,083.34 per month following the "date upon which the FCC has approved by Final Order the FCC Long Term Lease Application." *See id.* at Secs. 2.1, 3.1.

The parties agreed on how to terminate the Agreement in the event of a default. Pursuant to Section 12.2 of the Agreement, prior to terminating the Agreement, the non-defaulting party of the Agreement must give thirty days' prior notice of a material breach of the Agreement to the defaulting party. *See id.* The notice must be in writing and sent by a "reliable national express overnight delivery service" in accordance with Section 19 of the Agreement. *See id.*

The parties further agreed that Utopian could seek specific performance of the Agreement in the event of UNA's breach. Pursuant to Section 20.2 of the

8

Agreement, "[UNA] acknowledges that the License and Channels subject to this Agreement are unique and the loss to [Utopian] due to [UNA]'s failure to perform this Agreement could not be easily measured with damages. Lessee will be entitled to injunctive relief and specific enforcement of this Agreement in a court of equity without proof of specific monetary damages, but without waiving any right thereto, in the event of breach of this Agreement by [UNA]."

### E.   Utopian defaulted UNA on January 25, 2021.

A dispute arose between the parties in December 2020 regarding the validity of the Agreement. *See* Complaint, Doc. 1 ¶¶ 23-27. Despite accepting many goods and services from Utopian and obtaining reinstatement of its EBS license at the sole expense of Utopian, UNA refused to accept monthly payments from Utopian and refused to cooperate with Utopian in the filing of the long-term lease application. *See id.*

In accordance with the default provisions of the Agreement, Utopian sent a letter to the University, on or around January 22, 2021, requesting that the University cooperate in filing Form 608 for the long-term lease application. *See id.* ¶ 28. In its letter, Utopian further advised UNA that, pursuant to Sections 10.1 and 20.2 of the Agreement, it was requiring UNA to cooperate in filing Form 608. *See id.* Utopian has tendered monthly payments to UNA multiple times, and UNA has refused to accept those payments or recognize the Agreement and file the FCC Form 608 Long

Term Lease Application. *See id.* ¶¶ 23-29.  Since entering into the Agreement with Utopian, UNA has never issued Utopian any form of default notice under the terms of the Agreement, or transmitted any other complaint or demand, regarding the filing of a long-term lease application or commencement of the Agreement or payments thereunder. UNA continued to accept and receive all the benefits, goods, and services provided by Utopian under the Agreement, until Utopian requested commencement of the lease and that UNA file the requisite FCC Form 608 long-term lease application at which time UNA first disclaimed Utopian's rights under the Agreement.

## II.    **Law and Argument**

### A.    **Legal Standard**

"Rule 12(b)(6), Federal Rules of Civil Procedure, permits a court to dismiss a complaint if it fails to state a claim for which relief may be granted. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court revisited the applicable standard governing Rule 12(b)(6) motions to dismiss. First, courts must take note of the elements a plaintiff must plead to state the applicable claims at issue." *Kelley v. Decatur Baptist Church*, No. 5:17-CV-1239-HNJ, 2018 WL 2130433, at *3 (N.D. Ala. May 9, 2018).

"After establishing the elements of the claim at issue, the court identifies all well-pleaded, non-conclusory factual allegations in the complaint and assumes their veracity. Well-pleaded factual allegations do not encompass mere 'labels and

conclusions,' legal conclusions, conclusory statements, or formulaic recitations and threadbare recitals of the elements of a cause of action. In evaluating the sufficiency of a plaintiff's pleadings, the court may draw reasonable inferences in the plaintiff's favor." *Id.* (internal citations omitted).

"Third, a court assesses the complaint's well-pleaded allegations to determine whether they state a plausible cause of action based upon the identified claim's elements. Plausibility ensues 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and the analysis involves a context-specific task requiring a court to draw on its judicial experience and common sense. The plausibility standard does not equate to a probability requirement, yet it requires more than a mere possibility of misconduct or factual statements that are merely consistent with a defendant's liability." *Id.* at *4 (internal citations and quotations omitted).

**B.**     **Utopian's Complaint states a claim of relief against Defendants Kitts and Trapp to compel the performance of UNA's contractual duties.**

Sovereign immunity does not shield a state entity from fulfilling their end of a bargain when a state entity enters into a contract, and accepts goods and services from the other contracting party. Kitts, as UNA President, and Trapp, as President of UNA's Board of Trustees, have the responsibility of ensuring that UNA fulfills its contractual obligations. Utopian's Complaint states a claim for relief against Kitts

and Trapp, in their official capacities as state officials, to compel the performance of UNA's contractual obligations with Utopian. Importantly, it was UNA's President leading up to the time the Agreement was executed, Dr. William G. Cale, Jr., who specifically directed UNA's then Vice President for Business and Finance, Dr. W. Stephen Smith (the signatory of the Agreement for UNA), and UNA's counsel, to negotiate and enter into the Agreement. The negotiation and execution of the Agreement over the course of several months did not happen in a vacuum.

With respect to actions against state officials in their official capacity, Alabama law provides several exceptions to sovereign immunity which are applicable in this case. "Certain actions [against state officials] are not barred by § 14 [of the Alabama Constitution]. There are six general categories of actions that do not come within the prohibition of § 14: (1) <u>actions brought to compel State officials to perform their legal duties</u>; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) <u>actions to compel State officials to perform ministerial acts</u>; (4) actions brought against State officials under the Declaratory Judgments Act, [], seeking construction of a statute and its application in a given situation; (5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a

mistaken interpretation of law." *Ohio Valley Conf. v. Jones*, 385 So. 3d 948, 957 (Ala. 2023) (quoting *Ex Parte Hampton*, 189 So. 3d 14, 17-18 (Ala. 2015)) (emphasis added).

Regarding the first category (compelling a state official to perform a legal duty) and third category (compelling a state official to perform a ministerial act), Alabama courts hold that, where a state entity has contracted for goods and services and accepted those goods and services, the contracting party may sue state officials to compel their obligations arising from the contract. *See id.* at 958. Where the state entity enters into the contract and accepts goods and services, it has no discretion to avoid its obligations under the contract. *See Alabama Agric. & Mech. Univ. v. Jones*, 895 So. 2d 867, 878-79 (Ala. 2004). "Consequently, mandamus [is] an available remedy to compel state agents to perform the essentially ministerial act of rendering payment for goods or services accepted." *Id.* at 881.

In *Williams v. Hank's Ambulance Service*, the Alabama Supreme Court summarized the reasoning behind this exception to sovereign immunity:

> As was noted in *Horn*, this Court has tried to take a case-by-case commonsensical approach to interpreting [Ala. Const. Art. I,] § 14 and applying the State's sovereign immunity. The common thread running through the cases discussed above is the unfairness that would have occurred from allowing the State to arbitrarily avoid its financial obligations. There was, and is, no legitimate reason to allow state department heads to avoid their clear contractual or ministerial obligations (once those obligations are determined), even if the performance of those obligations ultimately touches the state treasury.

> Such avoidance of legal and moral responsibility by the State was not
> the intent of the framers of the Constitution.

688 So. 2d 1230, 1237 (Ala. 1997).

Utopian does not ask for UNA to *pay* for the goods and services rendered by Utopian. It asks for enforcement of the Agreement and an order to compel UNA to comply with its end of the bargain. In exchange for Utopian's goods and services, UNA agreed to file Form 608. Although Utopian's claim asks for specific performance of a contractual obligation (*i.e.*, filing Form 608) as opposed to payment for goods and services rendered, Alabama law provides for a claim for relief where the performance of the contractual obligation is ministerial—that is, one arising under the terms of the contract after goods and services are accepted.

For instance, in *Burch v. Birdsong*, the plaintiff sued a school board and state officials for breach of an employment contract and for reinstatement of her employment. *See* 181 So. 3d 343, 346 (Ala. Civ. App. 2015). The defendants argued sovereign immunity applied and that the exceptions to sovereign immunity did not apply because the plaintiff was not seeking to enforce a ministerial act. *See id.* at 347. The plaintiff argued that her suit was not barred by sovereign immunity because "it sought to compel [the defendants] to perform a legal duty and to perform a ministerial act: to honor and perform their obligations under the alleged employment contract." *Id.* at 350. Specifically, the plaintiff argued that the state officials had no discretion under the employment contract to terminate it once the contract was

14

executed and that it was unlawful to terminate the contract. *See id.* The court held

that sovereign immunity did not bar plaintiff's claim because it sought enforcement

of the contract, as opposed to compensatory damages which may otherwise be barred

by sovereign immunity. *See id.* at 350-51; *see* also *Ex parte Moulton*, 116 So. 3d

1119, 1133 (Ala. 2013) ("The first 'exception' provides that 'actions brought to

compel State officials to perform their legal duties' are not barred by the doctrine of

State immunity." (quoting *Alabama Department of Transportation v. Harbert*

*International, Inc.*, 990 So. 2d 831, 840 (Ala. 2008) (holding that university

employee properly plead claims against university officials to perform their duties)).

Here, the first exception (compelling a state official to perform a legal duty)

and third exception (compelling a state official to perform a ministerial act) to

sovereign immunity applies.  The parties agreed that Utopian would provide services

and goods to UNA for the reinstatement of its EBS license and for compliance of its

license. Utopian would also pay monthly fees to UNA once the parties cooperated

in filing the long-term lease application. Utopian has provided goods and services,

UNA accepted them, and UNA benefitted from them.[3] UNA now refuses to perform

its end of the bargain in cooperating in the filing of Form 608. Utopian stands ready

---

[3] Paragraph 32 of the Complaint states: "The University, Kitts, and Tripp contracted for goods
and/or services with Utopian, accepted those goods and/or services, and are therefore entitled to
perform under the Agreement and/or compensate Utopian for those goods and/or services." Doc.
1.

and willing to begin monthly fee payments to UNA, and indeed, has sent UNA monthly fee payments multiple times, all of which UNA has refused.

UNA accepted goods and services from Utopian, agreed to cooperate in filing Form 608, and agreed, under Section 20.2 of the Agreement, that Utopian could seek specific performance of the Agreement.[4] Contrary to its incorrect claims in the Motion to Dismiss, UNA does not have any "property right" in the spectrum license, and thus, Utopian's claims do not affect a property right of the State. *See In re NextWave*, 200 F.3d at 51. However, the Agreement *did* create a property right in favor of Utopian, which UNA now disclaims. Under the terms of the Agreement, UNA does not have discretion to choose to not file Form 608. Alabama's sovereign immunity laws do not shield Kitts and Trapp from performing their legal duties or ministerial acts under the Agreement.

### C.    Utopian's Agreements with UNA can be enforced against Kitts and Trapp, even though they were not signatories.

As discussed in Section B, Utopian's Complaint states a claim for relief against Kitts and Trapp in their official capacities as the state officials in charge of fulfilling UNA's legal duties. Kitts and Trapp are proper defendants in this mandamus action brought to compel them to perform their legal duties and

---

[4] Paragraph 33 of the Complaint states: "Pursuant to Section 20.2 of the Agreement, the University expressly agreed to injunctive relief and specific performance as a contractual remedy in the event of the University's failure to perform its duties under the Agreement." Doc. 1.

ministerial acts pursuant to Utopian's Agreement and Equipment Lease with UNA, both of which were properly executed on behalf of UNA by UNA's Vice President of Business and Financial Affairs, W. Steven Smith, under the specific direction of UNA's then President, Dr. William Cale. *See* Agreement, Doc. 1-1 at p. 14; Equipment Lease, Doc. 1-2 at p. 3.

Alabama courts have recognized that university officials are the proper defendants in mandamus actions brought against universities to enforce contracts. In *Ohio Valley Conf. v. Jones*, the plaintiff filed a mandamus action against the Chair of the Jackson State University Board of Trustees, Jones, and the President of Jackson State University, Killingsworth, in their official capacities, to enforce the terms of a contract between the plaintiff and Jackson State University. 385 So. 3d at 958. Plaintiff's complaint alleged that "Jones and Killingsworth had the responsibility to follow established procedures for the payment of [JSU's] contractual obligations and debts due and owing, and also to follow guidelines and established accounting procedures to ensure that established obligations, such as those owed to the [plaintiff], were paid. Jones and Killingsworth failed to meet these responsibilities or follow these guidelines and established accounting procedures. These acts and omissions constitute violations of ministerial, rather than discretionary, duties." *Id.* at 953. The Court ruled that the plaintiff's mandamus claims against Jones and Killingsworth for non-discretionary actions—to pay the

17

University's contractually-obligated debts—were not barred by sovereign immunity. *Id.* at 965.

Similarly, here, Utopian sued Kitts in his official capacity as the President of the University of North Alabama and sued Trapp in his official capacity as the President of the Board of Trustees for the University of North Alabama. *See* Complaint, Doc. 1 ¶¶ 2-3. Utopian's Complaint alleges that "Defendants Kitts and Trapp have the responsibility to perform their legal duties, including following established procedures and guidelines for the performance, recognition, cooperation, and/or payment of the University's contractual obligations to Utopian." *Id.* ¶ 31. Kitts and Trapp are proper defendants in this mandamus action brought to compel them to perform their legal duties and ministerial acts.

To the extent the Court agrees with Kitts and Trapp that they are not the proper defendants in this mandamus action because they did not sign the agreement, Utopian would request leave to amend its Complaint to name UNA as a defendant. Alabama courts have ruled that contractual obligations may be enforced against public universities as defendants when the public university accepts goods and services. For instance, in *Marous Brothers Construction v. Alabama State University*, the court denied the university's motion to dismiss which the university asserted on grounds of sovereign immunity. *See* 533 F. Supp. 2d 1199, 1201-02 (M.D. Ala. 2008). The plaintiff alleged that the university had accepted goods and

services under a construction contract and that the university failed to perform its obligations under the contract. *See id.* at 1201. The court held that, "[a]ccepting these facts as true, which the court must do at this stage of the litigation, the court finds that the allegations establish that ASU legally contracted under state law for services and accepted such services and, thus, is legally obligated to pay for the services accepted under the terms of the agreement." *See id.* at 1201-02.

### D.   UNA's failure to file Form 608 within 90 days of reinstatement does not preclude Utopian from enforcing its rights.

UNA argues that, because Form 608 was never filed within 90 days of reinstatement of its license, Utopian cannot now compel them to file it. Although Section 10.4 of the Agreement contemplates that the parties file Form 608 "[w]ithin ninety (90) days following reinstatement and renewal of the License by the FCC by Final Order," nowhere in the Agreement does the failure to file within 90 days prevent Utopian from seeking specific performance. Nor does the Agreement affirmatively require only Utopian to prepare, sign and submit the FCC Form 608. To the contrary, the Agreement provides that the parties are required to cooperate together in the preparation and filing of the FCC Form 608 long-term lease application and all FCC filings required to effectuate the Agreement (which is the purpose of Form 608). Further, nowhere in the Agreement is there any requirement specifically obligating Utopian to initiate any such FCC application, as the language of the Agreement is clear that "the Parties" prepare, sign, and file these documents

together (except in the case of FCC filings involving the operation by Utopian of the excess capacity spectrum subject to the Lease that are filed by Utopian solely and do not require cooperation from UNA). *See* Agreement, Doc. 1-1, Secs. 10.1 and 10.4. To read the Agreement otherwise would render the default and remedy provisions of the Agreement meaningless, and would permit UNA to avoid its obligations by not merely cooperating in filing Form 608 and letting the 90-day clock run.

Additionally, any dispute concerning whether the failure to file within 90 days is a material default would be a fact issue inappropriate for the Court to determine at the motion to dismiss stage. This is particularly relevant considering it is undisputed that UNA did not default Utopian under the Agreement on this or any other issue.

More importantly, however, the two federal court opinions mentioned previously, *Utopian Wireless Corp. v. Assumption High School*, No. 21-444 (E.D. La. May 25, 2021), 2021 WL 2115332 and *Utopian Wireless Corp. v. Central Lafourche High School*, No. 20-03376 (E.D. La. Nov. 3, 2021), 2021 WL 5113165, held that Utopian stated a claim for relief to enforce the school entity to file Form 608 even though the long-term lease application had not been filed within the 90 days contemplated in the contracts.

20

In both cases, the contracts between Utopian and the school entities contemplated that the parties would cooperate in filing Form 608 within 90 days of the execution of the EBS agreements. *See id.* Just like here, the agreements in both cases were executed in 2007, but the long-term lease applications were never filed. *See Assumption High*, at *2; *Central Lafourche*, at *1. Just like here, disputes arose in 2020 regarding the validity of the Agreements and the cooperation of the filing of the long-term application. *See Assumption High*, at *3; *Central Lafourche*, at *2. Just like here, both school entities refused to accept fee payments from Utopian, refused to cooperate in the filing of Form 608, and Utopian defaulted the school entities under the terms of the Agreement. *See id.* Just like here, the school entities filed motions to dismiss arguing that the Agreement could not be enforced. *See id.* <u>Both courts held that Utopian stated a claim for relief against the school entities for specific performance to compel the schools to cooperate in filing Form 608, and further, that the contracts were in full force and effect despite the passage of time</u>. *See Assumption High*, at *6-7; *Central Lafourche*, at *5.

Here, Alabama law provides for the remedy of specific performance. *See* Ala. Code § 7-2A-521(1). Utopian and UNA have a valid contract where the parties agreed to specific performance. *See* Agreement, Doc. 1-1; *see also Coley v. Lang*, 339 So. 2d 70 (Ala. Civ. App. 1976); Foy v. Foy, 484 So. 2d 439 (Ala. 1986) ("A valid contract must be in existence before the court can specifically enforce it.").

Utopian has provided goods and services to UNA under the Agreement. Utopian has also tendered fee payments to UNA multiple times, evidencing that it is ready and willing to perform under the Agreement. *See Jackson v. L.D. McReynolds, Inc.*, 430 So. 2d 873 (Ala. 1983). UNA never defaulted Utopian, which it is required to do under the Agreement in order to terminate it. Nowhere in the Agreement does the failure to file Form 608 within 90 days of reinstatement prevent Utopian from seeking specific performance, as found by the courts in *Assumption High* and *Central Lafourche*. UNA's failure to file Form 608 within 90 days of reinstatement of its license does not prevent Utopian from enforcing its rights under the Agreement.

### E.    <u>Utopian's Complaint is not barred by the statute of limitations.</u>

Contract actions, generally, must be commenced within 6 years. *See* Ala. Code § 6-2-34(9). The parties' dispute first arose in December 2020 when UNA first refused to cooperate in filing Form 608, refused to accept monthly fee payments, and disavowed the existence of the Agreement. *See* Complaint, Doc. 1 ¶¶ 23-27. Utopian provided its default notice to UNA on or around January 22, 2021, requesting that the University cooperate in filing Form 608 for the long-term lease application. *See id.* ¶ 28. UNA's defaults are also continuous in nature. Utopian

timely filed its Complaint on November 26, 2024—within the six-year period for contract actions.[5]

### F.    In the alternative, Utopian requests leave to amend.

Federal Rule of Civil Procedure (a)(2) provides that a party may amend its complaint with leave of court and that "[t]he court should freely give leave when justice so requires."  If, in the alternative, this Court is inclined to grant Defendants' Motion to Dismiss, Utopian respectfully requests that this Court permit Utopian leave to amend its pleading in the interests of justice to compel the specific performance of Utopian's contractual rights with UNA.  To deny Utopoian the right to enforce its written agreements with UNA that expressly provide for specific performance, and after having rendered goods and services, would be to deny Utopian's right to seek justice.

---

[5] In fn. 5 of its Memorandum in Support of its Motion to Dismiss [Doc. 14], Defendants alternatively argue that laches bars Utopian's Complaint. A laches defense is an affirmative defense which must be pled in Defendants' Answer. *See Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993) ("The strictures of Rule 12(b)(6), wherein dismissal of the claim is based solely on the complainant's pleading, are not readily applicable to a determination of laches."). Laches is not a proper argument on a 12(b)(6) Motion to Dismiss, as found by the courts in *Assumption High*, 2021 WL 2115332, at *6 and *Central Lafourche*, 2021 WL 5113165, at *5 ("Laches is an equitable defense born from the longstanding maxim 'equity aids the vigilant, not those who slumber their rights.'" The Supreme Court of Delaware has held that a defense of laches 'generally requires the establishment of three things: first, knowledge by the claimant; second, unreasonable delay in bringing the claim; and third, resulting prejudice to the defendant.' *Reid v. Spazio*, 970 A.2d 176, 182-83 (Del. 2009). Here, the issues of knowledge, unreasonable delay, and prejudice are not apparent from the face of Plaintiff's Amended Complaint, and thus, it is not suitable for this Court to decide the issue of laches at the motion to dismiss stage.").

## III.  **Conclusion**

For these reasons, Utopian requests that this Court deny Defendants' Motion to Dismiss [Doc. 13].  In the alternative, Utopian requests leave to replead and file an Amended Complaint.


Dated:  February 21, 2025            Respectfully submitted,


                                     /s/Vincent J. Graffeo
                                     Vincent J. Graffeo
                                     GRAFFEO LAW, LLC
                                     2119 3rd Ave. N., Suite 203
                                     Birmingham, AL  35203
                                     Telephone: (205) 994-8249
                                     Fax: (205) 994-8215
                                     Email: vincent@graffeolaw.com

                                     -and-


                                     Ryan O. Luminais, Admitted *Pro Hac Vice*
                                     Curtis J. Case, Admitted *Pro Hac Vice*
                                     SHER  GARNER  CAHILL  RICHTER
                                     KLEIN & HILBERT, L.L.C.
                                     909 Poydras Street Suite 2800
                                     New Orleans, LA 70112
                                     504-299-2100 (main)
                                     Email: rluminais@shergarner.com
                                             ccase@shergarner.com

                                     ***Counsel for Plaintiff Utopian Wireless Corporation***

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing document electronically filed with the Clerk of Court using the CM/ECF system, mail and/or email on this the 21st of February, 2025.

John E. Goodman, Esq. (jgoodman@bradley.com)
Matthew J. Lloyd, Esq. (mlloyd@bradley.com)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 5th Ave. N.
Birmingham, AL. 35203
***Attorneys for Defendants Kenneth D. Kitts***
***and William A. Trapp***

*/s/Vincent J. Graffeo*