FILED

2025 Jun-03 AM 09:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| UTOPIAN WIRELESS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 3:24-cv-01644-HNJ |
| KENNETH KITTS, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Utopian Wireless Corporation (Utopian) asserts a claim for injunctive relief and specific performance against Defendants Kenneth D. Kitts, in his official capacity as President of the University of North Alabama (UNA), and William A. Trapp, in his official capacity as President *Pro Tempore* of UNA's Board of Trustees.[1] Plaintiff asserts Defendants failed to comply with the terms of a May 18, 2007, Educational Broadband Service Lease Agreement between UNA and Utopian Wireless. (Doc. 1).

Defendants moved to dismiss Plaintiff's Complaint. (Doc. 13). As discussed

---

[1] Plaintiff's Complaint asserts Trapp is the President of the University of North Alabama (UNA) Board of Trustees (Doc. 1, ¶ 5), yet Defendants assert Trapp actually constitutes the President *Pro Tempore*. (Doc. 14, at 1 n.1). Indeed, Alabama Code § 16-51-3 names the Governor the "ex officio president of the board." Plaintiff does not dispute that characterization, and in any event, no party asserts the distinction between President and President *Pro Tempore* of the Board bears any significance in this case.

1

herein, Eleventh Amendment sovereign immunity protects Defendants from Plaintiff's claims. Accordingly, the court will grant Defendants' motion to dismiss.

## ALLEGATIONS OF PLAINTIFF'S COMPLAINT

The Federal Communications Commission (FCC) regulates the use of radio frequencies in the United States by issuing "spectrum licenses" that "authorize a licensee to transmit on specific frequencies or ranges of frequencies in particular geographic areas." (Doc. 1, ¶ 6). One type of spectrum license – an Educational Broadband Service (EBS) – allows wireless carriers to provide nationwide "advanced wireless services, including mobile broadband services." (*Id.* ¶ 8). The FCC permits holders of EBS licenses "to lease their licenses to third-party wireless carriers for terms of 30 years." (*Id.*). The leases represent valuable commodities, as third-party lessors may use the broadband spectrum for commercial purposes. (*Id.* ¶ 9).

On an unspecified date, the FCC issued UNA License WNC713 for channels A1-A4 "to transmit in the Florence, Alabama area." (*Id.* ¶ 10). On May 18, 2007, Utopian and UNA entered into an Educational Broadband Service Lease Agreement (the Lease Agreement) regarding those channels. (*Id.* ¶ 11; *see also* Doc. 1-1, at 1). The Lease Agreement recites that UNA's license "expired without a timely-filed renewal on July 14, 2005, and was canceled by the FCC on December 16, 2006, however [UNA] intends to petition the FCC to reinstate and renew the License." (Doc. 1-1, at 1; *see also* Doc. 1, ¶ 14).

The Lease Agreement defines its "commencement date" as "the date upon which

the FCC has approved by Final Order the FCC Long Term Lease Application," and its "effective date" as May 18, 2017. (Doc. 1-1, §§ 1.6.4, 1.6.9; *see also id.* at 1). The initial term of the Lease Agreement "begins on the Commencement Date and ends on the date that is ten (10) years from the Commencement Date, unless the Agreement is terminated earlier . . . ." (*Id.* § 2.1; *see also* Doc. 1, ¶¶ 12-13). The Lease Agreement automatically renews ten years after the commencement date, and then ten years thereafter, for a maximum duration of 30 years, unless Utopian notifies UNA in writing at least 90 days prior to the expiration of the initial term or any ten-year renewal period that it declines to renew the agreement. (Doc. 1-1, § 2.2; *see also* Doc. 1, ¶¶ 12-13).

> In the event that the License expires without a pending renewal application during the Term, this Agreement will also expire at such time unless the License is renewed and FCC authorization for this Agreement is extended. [UNA and Utopian] will cooperate to timely file a renewal application for the License, in conjunction with a request for an extension of the then-applicable Initial Term or Renewal Term, to the date that is ten (10) years from the beginning of such Initial Term or Renewal Term. This Agreement will continue to apply unless the FCC denies by Final Order any application for renewal of the License or extension of the Term.

(Doc. 1-1, § 2.3).

Utopian agreed to pay UNA a monthly fee of $2,083.34 "[w]ithin five (5) days following the Commencement Date and on the first day of each month thereafter." (Doc. 1-1, § 3.1; *see also* Doc. 1, ¶ 16).

The Lease Agreement stated as follows regarding the parties' responsibilities for licenses and fees:

> 10.1.  Application Preparation.  [Utopian] will prepare and submit

3

in its name all applications, amendments, petitions, requests for waivers, and other documents necessary for the proper operation of Lease Capacity. [UNA] will file applications, amendments, petitions, requests for waivers, and other documents necessary for the modification, maintenance and renewal of the License, that under FCC Rules, may only be filed by [UNA], including any such filings reasonably requested by [Utopian]. [Utopian] will have its regulatory counsel prepare such documents on [UNA]'s behalf at [Utopian]'s sole expense. [Utopian] will also have [Utopian]'s legal counsel prepare a petition for reinstatement and renewal of the canceled License, along with all associated waivers required, at [Utopian]'s sole expense. The parties will cooperate in the preparation and submission of all applications, amendments, petitions, requests for waivers, and other documents necessary to secure any FCC approval, consent or other action required to effectuate this Agreement. [UNA] will not be responsible for any expenses, fees or costs under this subsection 10.1.

10.2.  Application Costs. [Utopian] will, at its own expense, prepare all applications, notices, certificates, exhibits, Interference Consents, approvals, or authorizations that [Utopian] submits to the FCC or seeks to have [UNA] submit to the FCC pursuant to the Agreement. [Utopian] will also promptly pay or reimburse [UNA] for its reasonable out-of-pocket expenses in connection with the activities requested or required of [UNA] by [Utopian] under this Agreement, including all such filings prepared by [Utopian]'s legal counsel on behalf of [UNA]. [UNA] will not be responsible for any expenses, fees or costs under this subsection 10.2.

10.3.  Regulatory Fees. [Utopian] will pay any federal regulatory fees associated with the License upon receipt of notice that such fees are due.

10.4.  FCC Long Term Lease Application. Within ninety (90) days following reinstatement and renewal of the License by the FCC by Final Order, the Parties agree to cooperate as required to fully prepare, file, prosecute, and defend the FCC Long Term Lease Application, all at [Utopian]'s expense. In the event a petition for reconsideration is filed against the grant of an FCC Long Term Lease Application, or if the FCC determines to reconsider such grant on its own motion, [Utopian] shall determine at its option whether to delay commencement of the Initial Term until resolution of such reconsideration and, in the event of such

delay, it will notify [UNA] in writing.

(Doc. 1-1, §§ 10.1-10.4; *see also* Doc. 1, ¶ 15).

The Lease Agreement provides it will automatically terminate "upon an FCC Final Order revoking, terminating, canceling or denying renewal of the License or any Channels therein." (Doc. 1-1, § 12.1).  Either party may terminate the Lease Agreement

> upon uncured material breach of the other Party, provided that the breaching Party shall be provided with written notice by the non-breaching Party of the alleged grounds for the breach and allowed a thirty (30) day period for cure following such notice; provided, however that if the defaulting Party proceeds with reasonable diligence during such thirty (30) day period and is unable, because of circumstances beyond its control or because of the nature of the default, to cure the default within such applicable time period, the time for cure shall be extended, but in no event beyond one hundred eighty (180) days after receipt of written notice from the non-defaulting Party.

(Doc. 1-1, § 12-2; *see also* Doc. 1, ¶ 17).  Any party providing notice to the other party pursuant to the Agreement must use "a reliable national express overnight delivery service," and such delivery "will be effective upon receipt." (Doc. 1-1, § 19; *see also* Doc. 1, ¶ 17).

UNA agreed to

> use its best efforts to obtain and maintain all licenses, permits and authorizations required or desired by [Utopian], at [Utopian]'s expense, for the use of the Channels, and will remain eligible under the FCC Rules to provide the Lessee Capacity.  [UNA], at [Utopian]'s expense, will take all necessary steps to reinstate and renew the License, as required, and will not commit any act, engage in any activity, or fail to take any action that could reasonably be expected to cause the FCC to impair, revoke, cancel, suspend or refuse to reinstate or renew the License.

(Doc. 1-1, § 16; *see also* Doc. 1, ¶ 18).

5

The Lease Agreement provides for specific performance in the event of breach:

> [UNA] acknowledges that the License and Channels subject to this Agreement are unique and the loss to [Utopian] due to [UNA]'s failure to perform this Agreement could not be easily measured with damages. [Utopian] will be entitled to injunctive relief and specific enforcement of this Agreement in a court of equity without proof of specific monetary damages, but without waiving any right thereto, in the event of breach of this Agreement by [UNA].

(Doc. 1-1, § 20.2; *see also* Doc. 1, ¶ 19). The Lease Agreement also provided that

> [i]f any action shall be brought on account of any breach of or to enforce or interpret any of the terms, covenants or conditions of this Agreement, the prevailing Party will be entitled to recover from the other its reasonable attorneys' fees and costs, as determined by the court hearing the action.

(Doc. 1-1, § 20.3; *see also* Doc. 1, ¶ 20).

On October 10, 2011, Utopian and UNA also entered into an EBS Equipment Lease, which recited:

> Whereas, [Utopian] and [UNA] entered into that certain Educational Broadband Service Lease Agreement ("EBS Lease") between [Utopian] and [UNA].
>
> Whereas, [Utopian] has agreed to assist [UNA] in [UNA]'s implementation of services towards compliance with the November 1, 2011 Substantial Service deadline imposed by the Federal Communications Commission ("FCC") for [UNA]'s Educational Broadband Service ("EBS") channels.
>
> Therefore, for good and valuable consideration, the receipt of which is hereby acknowledged, [Utopian] hereby agrees to Lease to [UNA] [certain specified radio equipment].

(Doc. 1-2, at 1; *see also* Doc. 1, ¶ 21). Utopian agreed to prepare and file with the FCC on behalf of [UNA] a Form 601, substantial

6

service ("Substantial Service") compliance notification ("Compliance Notice") within five (5) days from [UNA]'s notification to [Utopian] that the Leased Equipment has been installed. In contemplation of [Utopian] filing such notice on behalf of [UNA], [UNA] hereby agrees to cooperate with [Utopian], and expressly authorizes [Utopian] to file on its behalf all FCC filings necessary and incidental to the Form 601 Substantial Service filing, a draft copy of which is included hereto as Attachment 2, including the Form 601 and attachments, and the requisite post transition modification application, also to be filed with the FCC on Form 601.

(Doc. 1-2, at 1, ¶ 2).

Utopian sent equipment to UNA pursuant to the EBS Equipment Lease. UNA accepted the equipment, installed it with Utopian's guidance, and used it to operate the EBS license. (Doc. 1, ¶ 21).

The installation and/or use of the equipment allowed [UNA] to achieve substantial service compliance with the FCC's licensing requirements and to preserve its license. . . . [UNA] was . . . able to meet its substantial service obligations with the FCC after Utopian furnished the necessary equipment and assistance for [UNA] to operate the license. Upon information and belief, [UNA] continues to be in possession of and is operating the equipment provided by Utopian.

(Id. ¶ 22).

On October 26, 2020, and November 5, 2020, Utopian mailed letters to UNA enclosing checks "in the amount of $2,083.34 for the monthly fee under the [Lease] Agreement." UNA returned both checks. (Id. ¶¶ 23-24). On December 2, 2020, Utopian e-mailed UNA "requesting that [UNA] file Form 608[2] for the long-term lease

---

[2] FCC Form 608 is a multi-purpose form. It is used to provide required notification or request approval for any spectrum leasing arrangement (Lease) entered into between an existing licensee (Licensee) in certain Wireless, Mobile Satellite Services, and/or Public Safety Radio Services and a spectrum lessee (Lessee). This form also is required

application." (*Id.* ¶ 25). "On December 3, 2020, Utopian received a letter from counsel to the University disavowing the existence of the Agreement. According to [UNA], because Form 608 was never filed, the Agreement never became effective." (*Id.* ¶ 26).

On January 12, 2021, UNA mailed Utopian a letter "again disavowing the existence of the Agreement and advising that any future monthly fee payments sent by Utopian would be destroyed." (*Id.* ¶ 27).

> On or around January 22, 2021, Utopian sent another letter to [UNA], again requesting that [UNA] file Form 608 for the long-term lease application. In its letter, Utopian further advised [UNA] that, pursuant to Sections 10.1 and 20.2 of the [Lease] Agreement, it was requiring the University to cooperate in filing Form 608. Utopian again enclosed a check in the amount of $2,083.34 for the monthly fee.

(*Id.* ¶ 28). Through subsequent communication, UNA continues "to disavow the existence of the [Lease] Agreement and refuse[s] to accept monthly fee payments by Utopian." (*Id.* ¶ 29). However, UNA "has never provided Utopian with any formal default notices of the [Lease] Agreement . . . pursuant to Section 12.2 of the Agreement, before terminating the Agreement," and UNA "has not filed the required FCC form 608 for application of a long-term lease extension, despite multiple requests by Utopian." (*Id.*).

---

to notify or request approval for any spectrum subleasing arrangement (Sublease). The data collected on the form is used by the FCC to determine whether the public interest would be served by the Lease or Sublease. The form is also used to provide notification for any Private Commons Arrangement entered into between a Licensee, Lessee, or Sublessee and a class of third-party users (as defined in Section 1.9080 of the Commission's Rules).

https://www.fcc.gov/sites/default/files/fcc_form_608.pdf (*last visited* May 9, 2025).

For its specific performance claim, Utopian alleges:

> 31. Defendants Kitt and Trapp have the responsibility to perform their legal duties, including following established procedures and guidelines for the performance, recognition, cooperation, and/or payment of [UNA]'s contractual obligations to Utopian.

> 32. [UNA], Kitts, and Trapp contracted for goods and/or services with Utopian, accepted those good and/or services, and are therefore entitled to perform under the [Lease] Agreement and/or compensate Utopian for those goods and/or services.

> 33. Pursuant to Section 20.2 of the [Lease] Agreement, [UNA] expressly agreed to injunctive relief and specific performance as a contractual remedy in the event of [UNA's] failure to perform its duties under the Agreement.

> 34. In entering into the [Lease] Agreement to obtain Utopian's services to cause the reinstatement of the University's expired and canceled EBS license, and accepting, installing, and utilizing Utopian's equipment to achieve compliance with the FCC for the license, as well as agreeing with Utopian in writing to lease spectrum rights in exchange for monthly fees, but disavowing the existence of such Agreement, Kitts and Trapp failed to perform their duties, meet their responsibilities, or follow the established guidelines or procedures.

> 35. Utopian seeks a writ of mandamus, injunctive relief, specific performance, and/or other relief to which it may equitably be entitled, including but not limited to: an order compelling Kitts and Trapp to cooperate with Utopian in filing the Form 608 for the long-term lease application, and enjoining Kitts and Trapp from disavowing the existence of the Agreement.

(*Id.* ¶¶ 31-35).

## DISCUSSION

Defendants seek dismissal pursuant to both Federal Rule of Civil Procedure 12(b)(1), for lack of jurisdiction, and Federal Rule of Civil Procedure 12(b)(6), for failure

to state a claim upon which the court can grant relief.  Typically, as a federal court must "satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case," *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999), a district court will address the Rule 12(b)(1) argument before addressing any other arguments, if warranted.  *See Silver Crown Invs., LLC v. Team Real Est. Mgmt., LLC,* 349 F. Supp. 3d 1316, 1323 (S.D. Fla. 2018) (citing *Ruhrgas AG,* 526 U.S. at 575; *Llano Funding Grp., LLC v. Gallo,* No. 9:14-CV-81562, 2015 WL 12791482 at *1-2 (S.D. Fla. 2015)) ("When deciding Rule 12(b) motions to dismiss, a district court first addresses any jurisdictional challenges.").

Here, Defendants invoke sovereign immunity pursuant to the Eleventh Amendment, which generally raises a jurisdictional challenge.  *See Myrick v. Fulton Cnty., Georgia*, 69 F.4th 1277, 1294 (11th Cir. 2023) (quoting *Seaborn v. Fla. Dep't of Corrs.*, 143 F.3d 1405, 1407 (11th Cir. 1998)) ("'An assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction.'").[3]  However as the Eleventh

---

[3] Defendants also assert that Article I, Section 14 of the Alabama Constitution grants them immunity from Plaintiff's claims.  *See* Ala. Const. Art. 1 § 14 ("[T]he State of Alabama shall never be made a defendant in any court of law or equity."); *see also Edwards v. Dothan City Sch.*, 82 F.4th 1306, 1313 (11th Cir. 2023) (citing *Ex parte Tuscaloosa Cnty.*, 796 So. 2d 1100, 1103 (Ala. 2000)) ("The State of Alabama generally enjoys absolute immunity from lawsuits under Article I, Section 14 of the Alabama Constitution. This immunity applies to arms or agencies of the state.").  However, that argument does not present a jurisdictional challenge in federal court.

In Alabama state courts, State immunity is "not an affirmative defense, but a jurisdictional bar" which "may not be waived[,]" *Alabama Dep't of Corr. v. Montgomery Cnty. Comm'n*, 11 So. 3d 189, 191-92 (Ala. 2008) (per curiam) (quotations omitted), "strip[ping] [state] courts of all power to adjudicate claims against the State, even if the State has not raised its immunity as a defense." [*Ex parte*] Pinkard, 373 So. 3d [192,] 198-99[ (Ala. 2022)].  However, in federal courts, state-law immunities from suit are

Circuit has explained, "the jurisdictional bar embodied in the Eleventh Amendment is a rather peculiar kind of jurisdictional issue," as it "does not automatically deprive a court of original jurisdiction." *McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252, 1257 (11ᵗʰ Cir. 2001) (cleaned up) (citing *United States v. SCS Bus. & Tech. Inst., Inc.,* 173 F.3d 890, 892 (D.C. Cir. 1999); *Wisconsin Dept. of Corrections v. Schacht,* 524 U.S. 381, 389 (1998); *Calderon v. Ashmus,* 523 U.S. 740, 745 n. 2 (1998)). Rather, it "grants the State a legal power to assert a sovereign immunity defense should it choose to do so.'" *Id.* (citing *Schacht*, 524 U.S. at 389). "Thus, unlike other jurisdictional bars, federal courts are required to consider whether the Eleventh Amendment strips them of jurisdiction only if the state defendant insists that it does." *Id.*

When a State alternatively argues that the Eleventh Amendment bars a plaintiff's claim, and that the plaintiff fails to state a claim upon which the court can grant relief, the State conditionally asserts the Eleventh Amendment immunity defense, thereby giving "a federal court the discretion to dispose of the merits favorably to the state or its officials if it chooses to do so." *Id.* at 1258-59. "Given modern caseload burdens, one of the paramount considerations in deciding whether to accept such an invitation

---

not jurisdictional matters, but are simply defenses that the proponent is required to raise and prove. This is because a "defense rooted in state law cannot define the jurisdiction of the federal courts, which derives from the Constitution and acts of Congress." *Green v. Graham*, 906 F.3d 955, 964 (11ᵗʰ Cir. 2018) (declining to consider a belatedly-raised defense of State immunity "under ordinary forfeiture principles").

*Turner-Pugh v. Monroe Cnty. Bd. of Educ.*, No. CV 1:23-00294-TFM-N, 2024 WL 4469209, at *6 (S.D. Ala. Aug. 16, 2024), *report and recommendation adopted*, No. 1:23-CV-294-TFM-N, 2024 WL 4202720 (S.D. Ala. Sept. 16, 2024) (alterations in original).

will be the difficulty of the Eleventh Amendment issues compared to the merits issues." *Id.* at 1259 (citing *Parella v. Ret. Bd.,* 173 F.3d 46, 56 (1st Cir. 1999)). In the present case, applying the Eleventh Amendment does not present significant difficulty. Accordingly, the court will first address Defendants' assertion of the Eleventh Amendment jurisdictional bar. *See id.* (affirming dismissal of a state agency under the Eleventh Amendment as "there is nothing difficult about the Eleventh Amendment issue as it relates to the claims against the Georgia Department of Community Health – those claims are clearly barred by the Amendment."). In so doing, the court observes Plaintiff did not address Defendants' Eleventh Amendment arguments in its response brief. (Doc. 22).

"Federal courts are courts of limited jurisdiction" and, as such, they possess the power to hear cases only as authorized by the Constitution or United States' laws. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001). Rule 12(b)(1) permits a district court to dismiss a case for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). The plaintiff bears the burden of persuasion on establishing the court's subject matter jurisdiction. *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citing *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942)).

The Eleventh Circuit establishes particular modes of review for Rule 12(b)(1)

challenges:

> [A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint. If the challenge is facial, the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised . . . Accordingly, the court must consider the allegations in the plaintiff's complaint as true . . .
>
> A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion . . . Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered. Furthermore, . . . the district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citing, *inter alia*, *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. May 20, 1981);[4] *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)) (internal quotation marks and alterations omitted).

Therefore, a factual challenge to subject matter jurisdiction typically permits a "'trial court . . . to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Williamson*, 645 F.2d at 413 (quoting *Mortensen v. First Federal Savings and Loan Association*, 549 F.2d 884, 891 (3rd Cir. 1977)). No presumptive truthfulness

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

would attach to a plaintiff's claims, and "'the existence of disputed material facts [would] not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" *Id.* (quoting *Mortensen,* 549 F.2d at 891); *see also Lawrence,* 919 F.2d at 1529.

"As a general proposition, the states, as sovereigns, enjoy immunity from lawsuits brought against them without their consent." *Williams v. Bd. of Trustees of the Univ. of Alabama,* 128 F.4th 1208, 1214 (11th Cir. 2025) (citing *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 72-73 (2000)).[5]  That immunity also extends to "'arms of the State.'"  *Id.* (citing *Manders v. Lee,* 338 F.3d 1304, 1308 (11th Cir. 2003)) (cleaned up).  In Alabama, a public university constitutes an arm of the State and generally enjoys sovereign immunity from suit.  *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 3 F.3d 1482, 1485 (11th Cir. 1993), *reh'g en banc granted, opinion vacated,* 19 F.3d 1370 (11th Cir. 1994), and *on reh'g,* 28 F.3d 1146 (11th Cir. 1994) (citing *Harden v. Adams,* 760 F.2d 1158 (11th Cir.), *cert. denied,* 474 U.S. 1007 (1985)); *Mitchell v. Univ. of N. Alabama,* 785 F. App'x 730, 735 (11th

---

[5] The Eleventh Amendment states:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI. As the Eleventh Circuit has observed, the Amendment "uses very 'narrow[]' language," yet courts often more broadly "refer to the states' 'Eleventh Amendment immunity.'"  *Williams v. Bd. of Trustees of the Univ. of Alabama,* 128 F.4th 1208, 1214 (11th Cir. 2025) (alteration in original) (quoting *Blatchford v. Native Vill. of Noatak & Circle Vill.,* 501 U.S. 775, 779 (1991)).  That construal reflects that

> since the Supreme Court's momentous decision in *Hans v. Louisiana,* 134 U.S. 1, 10 S. Ct. 504, 33 L. Ed. 842 (1890), courts "have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact" and "that the judicial authority in Article III is limited by this sovereignty." *Blatchford,* 501 U.S. at 779 . . . .

*Williams,* 128 F.4th at 1214.

Cir. 2019) ("Because UNA is a state university in Alabama, it is entitled to Eleventh Amendment immunity."). Officials of a public entity also enjoy sovereign immunity from suit when sued in their official capacities, as Utopian sued Kitts and Trapp in this action. *See Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)) ("Under the Eleventh Amendment, state officials sued for damages in their official capacity are immune from suit in federal court."); *Rusovici v. Univ. of Cent. Fla. through Bd. of Trs.*, No. 24-10074, 2024 WL 3634226, at *2 (11th Cir. Aug. 2, 2024) ("The Eleventh Amendment excludes from the jurisdiction of federal courts lawsuits against a state, which includes state universities like UCF and state officials like Verduin sued in their official capacity.").

Two exceptions exist to the general rule granting sovereign immunity to a State and its agencies and officials. "First, Congress, acting pursuant to its Fourteenth Amendment enforcement powers, . . . may 'abrogate' states' immunity" by "'unequivocally' expressing its intent to strip the states of their immunity," so long as Congress's use of that authority exhibits "'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Williams,* 128 F.4th at 1214 (citing U.S. Const. amend XIV, § 5; *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363, 365 (2001)).[6]

Second, a state "may consent to be sued." *Id.* at 1215.

---

[6] This review "often involves a deep dive into the measure's legislative history and underlying purposes." *Williams*, 128 F. 4th at 1215 (citations omitted).

Such consent can of course be manifested in the usual ways – say, through a contract or state statute waiving immunity. *See* [*Sossamon v. Texas,* 563 U.S. 277, 284 (2011)]  ("A State . . . may choose to waive its immunity in federal court at its pleasure."); *Port Auth. Trans-Hudson Corp. v. Feeney,* 495 U.S. 299, 306-07, 110 S. Ct. 1868, 109 L. Ed. 2d 264 (1990) (discussing state statutes that manifested consent to suit). But there's another possibility.  The Supreme Court has explained that a state may also be sued "if it has agreed to suit in the 'plan of the Convention,' which is shorthand for 'the structure of the original Constitution itself.'" *PennEast Pipeline Co., LLC v. New Jersey,* 594 U.S. 482, 500, 141 S. Ct. 2244, 210 L. Ed. 2d 624 (2021) (quoting *Alden v. Maine,* 527 U.S. 706, 728, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999)).  Under this "plan of the Convention" doctrine, there are "certain waivers of sovereign immunity to which all States implicitly consented at the founding." *Id.*  When a lawsuit slots into one of these "certain waivers," *id.,* "no congressional abrogation [is] needed" because there's nothing to abrogate – "the States ha[ve] already 'agreed in the plan of the Convention not to assert any sovereign immunity defense,'" *Allen v. Cooper,* 589 U.S. 248, 258-59, 140 S. Ct. 994, 206 L. Ed. 2d 291 (2020) (quoting *Cent. Va. Cmty. Coll. v. Katz,* 546 U.S. 356, 377, 126 S. Ct. 990, 163 L. Ed. 2d 945 (2006)).

*Williams*, 128 F.4th at 1215.

Established authority dictates the State of Alabama has not waived its sovereign immunity from suit.  *See Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (finding Article I, § 14, of the Alabama Constitution prohibits Alabama from giving its consent to suit and therefore the State of Alabama enjoyed sovereign immunity); *Boglin v. Bd. of Trustees of Alabama Agric. & Mech. Univ.*, 290 F. Supp. 3d 1257, 1263 (N.D. Ala. 2018) (citing *Alabama A & M University v. Jones*, 895 So. 2d 867, 873 (Ala. 2004)) ("Alabama has not waived its immunity.").[7]

---

[7] Plaintiffs cite two cases from federal courts in Louisiana that permitted claims by Utopian to "enforce the school entity to file Form 608 even though the long-term lease application had not been filed within the 90 days contemplated in the contracts."  (Doc. 22, at 20 (citing *Utopian Wireless Corp.*

Moreover, as Utopian's claims fall under state common law, not a federal statute, Congress has not expressed an intent to strip the State, or any official State actors, of their immunity from suit.

"In *Ex parte Young*, the Supreme Court recognized an exception to sovereign immunity in lawsuits against state officials for prospective declaratory or injunctive relief to stop ongoing violations of federal law." *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1288 (11th Cir. 2015) (citing *Ex parte Young*, 209 U.S. 123, 155-56 (1908)). However, the *Ex parte Young* doctrine does not apply in these circumstances, as Utopian does not allege a violation of federal law. Moreover, the Supreme Court has explicitly held that "*Ex parte Young* cannot be used to obtain . . . an order for specific performance of a State's contract." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256-57 (2011) (citing *Edelman v. Jordan,* 415 U.S. 651, 666-67 (1974), *overruled on other grounds by Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *In re Ayers,* 123 U.S. 443 (1887)); *see also Tamiami Partners, Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians*

---

*Assumption High School*, No. 21-444, 2021 WL 2115332 (E.D. La. May 25, 2021); *Utopian Wireless Corp. v. Central Lafourche High School,* No. 20-03376, 2021 WL 5113165 (E.D. La. Nov. 3, 2021)). However, the jurisdictional challenges in those cases concerned the amount-in-controversy requirement, not Eleventh Amendment sovereign immunity. Accordingly, neither case discussed whether the State waived its immunity in federal court. As aforementioned, Eleventh Amendment immunity does not automatically deprive a federal court of original jurisdiction. *See McClendon v. Georgia Dep't of Cmty. Health,* 261 F.3d 1252, 1257 (11th Cir. 2001); *see also Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 245 (5th Cir. 2005) ("[T]he Eleventh Amendment does not automatically destroy a federal court's jurisdiction over a claim; rather, it grants the state a legal power to assert a sovereign immunity defense, which it may raise or waive.") (citing *Wisconsin Dep't of Corrections v. Schacht*, 524 U.S. 381 (1998)). Thus, if the State in the above Louisiana cases declined to assert an Eleventh Amendment sovereign immunity defense, the court would not stand obligated to address the issue on its own.

*of Fla.*, 177 F.3d 1212, 1226 (11ᵗʰ Cir. 1999) ("*Ex parte Young* does not permit individual officers of a sovereign to be sued when the relief requested would, in effect, require the sovereign's specific performance of a contract."); *Pinkston v. Univ. of S. Fla. Bd. of Trs.*, No. 8:18-CV-2651-T-33SPF, 2019 WL 1383467, at *4 (M.D. Fla. Mar. 27, 2019) (Eleventh Amendment barred breach of contract claim against state officials "even though [the plaintiff] seeks specific performance of a contract rather than damages.").

Finally, Defendants did not waive sovereign immunity by entering into the Lease Agreement. "The test to determine if a state has waived its sovereign immunity 'is a stringent one.'" *Barnes v. Zaccari*, 669 F.3d 1295, 1308 (11ᵗʰ Cir. 2012) (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 675 (1999); *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241 (1985), *superseded by statute on other grounds*, Rehabilitation Act Amendments of 1986, Pub. L. No. 99-506, § 1003, 100 Stat. 1807, 1845; *Edelman,* 415 U.S. at 673). A State must "'unequivocally express[]'" its consent to suit. *Austin v. Glynn Cnty., Georgia*, 80 F.4th 1342, 1350 (11ᵗʰ Cir. 2023), *cert. denied sub nom. Austin v. Glynn Cnty.*, 144 S. Ct. 1060, 218 L. Ed. 2d 242 (2024) (quoting *Sossamon*, 563 U.S. at 284; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984)). Moreover, any waiver "must specifically permit suits *in federal court*," as "'a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation.'" *Barnes,* 669 F.3d at 1308 (emphasis added) (citing *Feeney,* 495 U.S. at 306; *Robinson v. Georgia Dep't of Transp.*, 966 F.2d 637, 640 (11ᵗʰ Cir. 1992); *Coll. Sav. Bank,* 527 U.S. at 676; *Smith v. Reeves,* 178 U.S. 436, 441-45 (1900)).

Though the Lease Agreement grants Utopian the right to "injunctive relief and specific enforcement of this Agreement in a court of equity" in the event of breach by UNA, the Agreement does not specify that UNA consents to suit in federal court. Thus, the Lease Agreement contains no explicit waiver of sovereign immunity that would warrant the exercise of federal jurisdiction over an action for its enforcement. 2 CIV. ACTIONS AGAINST STATE & LOC. GOV'T § 10:7 ("[S]tates cannot waive their Eleventh Amendment immunity from suit in federal court by the simple act of entering into a contract with a private party for the provision of goods and services; a breach of the contract by the state does not mean that the state has consented to suit in federal court.").

To be sure, there exist "limited exceptions where sovereign immunity does not apply to breach of contract claims." *Edwards v. Dothan City Sch.*, 82 F.4th 1306, 1313 (11th Cir. 2023) (citing *Ex parte Jackson Cnty. Bd. of Educ.*, 164 So. 3d 532, 536 (Ala. 2014)). "The Alabama Supreme Court has identified six exceptions to sovereign immunity:

> (1) actions brought to compel State officials to perform their legal duties;
>
> (2) actions brought to enjoin State officials from enforcing an unconstitutional law;
>
> (3) actions to compel State officials to perform ministerial acts;
>
> (4) actions brought under the Declaratory Judgments Act . . . seeking construction of a statute and its application in a given situation;
>
> (5) valid inverse condemnation actions brought against State officials in their representative capacity;

> (6)(a) actions for injunction brought against State officials in their representative capacity where it is alleged they acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law; and
>
> (6)(b) actions for damages brought against State officials in their individual capacity where it is alleged that they acted . . . beyond their authority."

*Id.* (quoting *Ex Parte Jackson*, 164 So.2d at 535-36 (citations omitted) (alterations in original).  Utopian contends the Defendants fall within the first and third exceptions, as it seeks to compel them to merely perform their legal and ministerial duties under the contract at issue.

Utopian's proposition rests upon the understanding that properly invoking one or more of the six exceptions does not incite sovereign immunity concerns:  "'These actions are sometimes referred to as 'exceptions' to § 14; however, in actuality these actions are simply not considered to be actions 'against the State' for § 14 purposes. *Patterson v. Gladwin Corp.*, 835 So. 2d 137, 142 (Ala. 2002).'" *Ohio Valley Conf. v. Jones*, 385 So. 3d 948, 958 n.3 (Ala. 2023) (quoting *Alabama Dep't of Transp. v. Harbert Int'l, Inc.*, 990 So. 2d 831, 840 (Ala. 2008), *abrogated on other grounds by Ex parte Moulton*, 116 So. 3d 1119 (Ala. 2013)); *see also Alabama State Univ. v. Danley*, 212 So. 3d 112, 123 (Ala. 2016) ("These actions are sometimes referred to as 'exceptions' to § 14; however, in actuality these actions are simply not considered to be actions 'against the State' for § 14 purposes."") (citations omitted); *Jones*, 895 So. 2d at 873 (characterizing the six exceptions to § 14 sovereign immunity as "several species of action that are not 'against the State' for § 14 purposes") (citation omitted).  Therefore, the six exceptions to § 14 sovereign immunity

20

apply to actions against state officials in federal court because they apparently are not 'against the State' of Alabama, and thus, Utopian may ostensibly rely upon the first and third exceptions to avoid the Eleventh Amendment prohibition of suits against States.

Nevertheless, Utopian cannot succeed in pursuing the first and third exceptions because it does not seek relief falling within their strictures.  In construal of the first and third exceptions, the Alabama Supreme Court has established that a claim actually proceeds against the State — and thus, incites sovereign immunity prohibitions — "if a claim against an officer seeks relief that would 'directly affect a contract or property right of the State' . . . such as by demanding money from the State treasury, *requesting specific performance of the State's contractual obligations*, or asking the court to quiet title to State lands . . . ."  *Ex parte Pinkard*, 373 So. 3d 192, 199 (Ala. 2022) (quoting *Mitchell v. Davis*, 598 So. 2d 801, 806 (Ala. 1992)) (emphasis added); *King v. Moon*, 697 F. Supp. 3d 1273, 1277 (N.D. Ala. 2023) (The "'touchstone' of a state immunity analysis 'is whether the claim is against the State, that is, whether a result favorable to the plaintiff would directly affect a contract or property right of the State' or 'would result in the plaintiff's recovery of money from the State.' . . . The way a plaintiff seeks relief from the State is by, for example, 'demanding money from the State treasury, requesting specific performance of the State's contractual obligations, or asking the court to quiet title to State lands.'") (citations omitted); *Wilson v. Dunn*, 618 F. Supp. 3d 1253, 1285 (N.D. Ala. 2022) ("State immunity now applies only 'if a claim against an officer seeks relief that would directly affect a contract or property right of the State – such as by demanding

money from the State treasury, requesting special performance of the State's contractual obligations, or asking the court to quiet title to State lands.'") (citation omitted); *see also Danley*, 212 So. 3d at 123 ("This Court has qualified those 'exceptions,' noting that 'an action *is* one against the State when a favorable result for the plaintiff would directly affect a *contract* or property *right* of the State, or would result in the plaintiff's recovery of money from the State.'") (citations omitted) (cleaned up) (emphasis in original); *Jones*, 895 So. 2d at 873 (same); *McDowell-Purcell, Inc. v. Bass*, 370 So. 2d 942, 944 (Ala. 1979) ("The writ of mandamus will not lie to compel [a State official] to exercise his discretion and apply the ascertained facts or existing conditions under [a] contract so as to approve payment to [a plaintiff] according to [the plaintiff's] interpretation of the contract rather than [the State official's]."); *c.f., Jones*, 385 So. 3d at 958 ("In short, regardless of whether the action at issue is permissible under category (1) or category (3) [of the § 14 exceptions], this Court has held that a court order is available to compel state officials to pay for goods or services that the particular state entity involved in the transaction had accepted."); *Marous Bros. Const., LLC v. Alabama State Univ.*, 533 F. Supp. 2d 1199, 1201-02 (M.D. Ala. 2008) (The "Supreme Court of Alabama 'has held that certain categories of actions do not come within the prohibition of § 14.' . . . One of those categories is 'actions brought to force state employees or agencies to perform their legal duties.' [T]he court finds that the allegations establish that ASU legally contracted under state law for services and accepted such services and, thus, is legally obligated to pay for the services accepted under the terms of the agreement. . . . It follows . . . that 'this

obligation is not subject to the doctrine of sovereign immunity' because 'it is in the nature of an action to compel a state agency to perform its legal duties and pay Plaintiffs for services contracted for and rendered.'") (citations omitted) (cleaned up); *Danley*, 212 So. 3d at 127 (The "takeaway from . . . *Marous Brothers* is that once the State has contracted for services *and has accepted those services,* it is legally obligated to pay for those services, and a claim seeking to enforce that legal obligation falls within the parameters of the first 'exception' to § 14 immunity") (emphasis in original).

The suit at bar seeks to compel the Defendants to enable specific performance of UNA's alleged, contractual obligations with Utopian. As a result, application of the principles articulated in the *Pinkard* decision categorizes this action as "substantively against the State for purposes of § 14." 373 So. 3d at 199. Therefore, the Eleventh Amendment bars Utopian's action.

In summary, as Defendants constitute arms of the State, Utopian requests an order requiring Defendants to perform under the terms of the Lease Agreement, and no exception to, or waiver of, sovereign immunity applies, the Eleventh Amendment bars Utopian's suit for specific performance.[8] As the Eleventh Amendment deprives this court of jurisdiction, the court cannot consider Defendants' arguments about

---

[8] The court observes Utopian also requests an order enjoining Kitts and Trapp from disavowing the existence of the Lease Agreement. (Doc. 1, ¶ 35). The Eleventh Amendment also bars that request for relief, as it effectively seeks the State's compelled performance of its contractual duties. *See Parfitt v. Llorens*, No. 2:19-CV-727-FTM-38-NPM, 2020 WL 3452225, at *8 (M.D. Fla. June 23, 2020) (*Ex parte Young* "does not allow suit against individual officers when the relief sought would effectively require the state's specific performance under a contract.").

Utopian's alleged failure to state a claim upon which the court can grant relief.

## CONCLUSION AND ORDER

As discussed herein, sovereign immunity bars Plaintiff's claim. Accordingly, the court **GRANTS** Defendants' motion to dismiss for lack of federal jurisdiction and **DISMISSES** Plaintiff's claims without prejudice. The court will enter a separate final judgment.

**DONE** and **ORDERED** this 3rd day of June, 2025.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE